# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 19, 2014                    Decided July 29, 2014

No. 13-5281

AMERICAN MEAT INSTITUTE, ET AL.,
APPELLANTS

v.

UNITED STATES DEPARTMENT OF AGRICULTURE, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:13-cv-01033)

———

*Catherine E. Stetson* argued the cause for appellants. With her on the briefs were *Jonathan L. Abram*, *Judith E. Coleman*, *Mary Helen Wimberly*, and *Elizabeth B. Prelogar*.

*Peter D. Keisler*, *Jonathan F. Cohn*, *Erika L. Myers*, *Rachel L. Brand*, *Steven P. Lehotsky*, and *Quentin Riegel* were on the brief for *amici curiae* The National Association of Manufacturers, et al. in support of appellants.

*Jonathan Hacker* and *Anton Metlitsky* were on the brief for *amicus curiae* Grocery Manufacturers Association in support of appellants.

*Daniel Tenny*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the briefs were *Stuart F. Delery*, Assistant Attorney General, *Ronald C. Machen Jr.*, U.S. Attorney, and *Mark B. Stern*, Attorney.

*Terence P. Stewart* was on the brief for intervenors United States Cattlemen's Association, et al. in support of appellees.

*Zachary B. Corrigan*, *Julie A. Murray*, *Scott L. Nelson*, and *Allison M. Zieve* were on the brief for *amici curiae* Food and Water Watch, Inc., et al. in support of appellees.

*Jonathan R. Lovvorn* and *Aaron D. Green* were on the brief for *amici curiae* American Grassfed Association, et al. in support of appellees.

*George A. Kimbrell* was on the brief for *amici curiae* Center for Food Safety, et al. in support of appellees.

*Mark E. Greenwold* was on the brief for *amici curiae* Tobacco Control Legal Consortium, et al. in support of appellees.

*Stephan E. Becker* was on the brief for *amicus curiae* The United Mexican States in support of neither party.

*Alan Kashdan* was on the brief for *amicus curiae* Government of Canada in support of neither party.

Before: GARLAND, *Chief Judge*, HENDERSON, ROGERS, TATEL, BROWN, GRIFFITH, KAVANAUGH, SRINIVASAN, PILLARD, WILKINS, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

Opinion concurring in part filed by *Circuit Judge* ROGERS.

Opinion concurring in the judgment filed by *Circuit Judge* KAVANAUGH.

Dissenting opinion filed by *Circuit Judge* HENDERSON.

Dissenting opinion filed by *Circuit Judge* BROWN, which *Circuit Judge* HENDERSON joins.

WILLIAMS, *Senior Circuit Judge*:  Reviewing a regulation of the Secretary of Agriculture that mandates disclosure of country-of-origin information about meat products, a panel of this court rejected the plaintiffs' statutory and First Amendment challenges.  The panel found the plaintiffs unlikely to succeed on the merits and affirmed the district court's denial of a preliminary injunction.  On the First Amendment claim, the panel read *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985), to apply to disclosure mandates aimed at addressing problems other than deception (which the mandate at issue in *Zauderer* had been designed to remedy).  Noting that prior opinions of the court might be read to bar such an application of *Zauderer*, the panel proposed that the case be reheard en banc.  The full court shortly voted to do so.  Order, *American Meat Institute v. USDA*, No. 13-5281 (D.C. Cir. Apr. 4, 2014) (vacating the judgment issued on Mar. 28, 2014, and ordering rehearing en banc).  We now hold that *Zauderer* in fact does reach beyond problems of deception, sufficiently to encompass the disclosure mandates at issue here.

* * *

Congress has required country-of-origin labels on a variety of foods, including some meat products, 7 U.S.C.

§§ 1638, 1638a, and tasked the Secretary of Agriculture with implementation, *id*. § 1638c. In the original statute, Congress did not define "country of origin," leaving that to the agency. Pub. L. No. 107-171, § 282, 116 Stat. 134, 533 (2002). After delaying the statute's implementation, see, e.g., Pub. L. No. 108-199, § 749, 118 Stat. 3, 37 (2004), Congress amended it in 2008 to define "country of origin," Pub. L. No. 110-234, § 11002, 122 Stat. 923, 1351-52 (2008). See also 153 Cong. Rec. 20,843 (2007) (statement of Rep. Peterson) (explaining the 2008 amendment as a compromise to allow the delayed country-of-origin mandate to go into effect). For meat cuts, at least, the amended statute defined country of origin based on where the animal has been born, raised, and slaughtered—the three major production steps. 7 U.S.C. § 1638a(a)(2).

The Secretary, whom we refer to interchangeably with his delegate the Agricultural Marketing Service ("AMS"), first promulgated rules in 2009. Mandatory Country of Origin Labeling, 74 Fed. Reg. 2658 (Jan. 15, 2009) ("2009 rule"). The rules did not demand explicit identification of the production step(s) occurring in each listed country, but called more simply for labeling with a phrase starting "Product of," followed by mention of one or more countries. 7 C.F.R. § 65.400 (2010). The 2009 rule also made allowance for a production practice known as "commingling." This made the labeling of meat cuts from animals of different origins processed together on a single production day relatively simple; the label could just name all the countries of origin for the commingled animals. *Id*. § 65.300(e)(2), (e)(4).

After the 2009 rule's adoption, Canada and Mexico filed a complaint with the Dispute Settlement Body of the World Trade Organization. In due course the WTO's Appellate Body found the rule to be in violation of the WTO Agreement on Technical Barriers to Trade. See Appellate Body Report, *United States—Certain Country of Origin Labelling (COOL)*

*Requirements*, WT/DS384/AB/R (June 29, 2012). The gravamen of the WTO's decision appears to have been an objection to the relative imprecision of the information required by the 2009 rule. See *id.* ¶ 343. In a different section of its opinion, the Appellate Body seemed to agree with the United States that country-of-origin labeling in general can serve a legitimate objective in informing consumers. *Id.* ¶ 453. A WTO arbitrator gave the United States a deadline to bring its requirements into compliance with the ruling.

The Secretary responded with a rule requiring more precise information—revealing the location of each production step. Mandatory Country of Origin Labeling, 78 Fed. Reg. 31,367 (May 24, 2013) ("2013 rule"). For example, meat derived from an animal born in Canada and raised and slaughtered in the United States, which formerly could have been labeled "Product of the United States and Canada," would now have to be labeled "Born in Canada, Raised and Slaughtered in the United States." In a matter of great concern to plaintiffs because of its cost implications, the 2013 rule also eliminated the flexibility allowed in labeling commingled animals. *Id.* at 31,367/3.

The plaintiffs, a group of trade associations representing livestock producers, feedlot operators, and meat packers, whom we'll collectively call American Meat Institute ("AMI"), challenged the 2013 rule in district court as a violation of both the statute and the First Amendment. This led to the decisions summarized at the outset of this opinion.

AMI argues that the 2013 rule violates its First Amendment right to freedom of speech by requiring it to disclose country-of-origin information to retailers, who will ultimately provide the information to consumers. See 7 U.S.C. § 1638a(e). The question before us, framed in the

order granting en banc review, is whether the test set forth in *Zauderer*, 471 U.S. at 651, applies to government interests beyond consumer deception. Instead, AMI says, we should apply the general test for commercial speech restrictions formulated in *Central Hudson*, 447 U.S. 557, 566 (1980). Given the scope of the court's order, we assume the correctness of the panel's rejection of plaintiffs' statutory claims.

\* \* \*

The starting point common to both parties is that *Zauderer* applies to government mandates requiring disclosure of "purely factual and uncontroversial information" appropriate to prevent deception in the regulated party's commercial speech. The key question for us is whether the principles articulated in *Zauderer* apply more broadly to factual and uncontroversial disclosures required to serve other government interests. AMI also argues that even if *Zauderer* extends beyond correction of deception, the government has no interest in country-of-origin labeling substantial enough to sustain the challenged rules.

*Zauderer* itself does not give a clear answer. Some of its language suggests possible confinement to correcting deception. Having already described the disclosure mandated there as limited to "purely factual and uncontroversial information about the terms under which [the transaction was proposed]," the Court said, "we hold that an advertiser's rights are adequately protected as long as [such] disclosure requirements are reasonably related to the State's interest in preventing deception of consumers." 471 U.S. at 651. (It made no finding that the advertiser's message was "more likely to deceive the public than to inform it," which would constitutionally subject the message to an outright ban. See

*Central Hudson*, 447 U.S. at 563.)  The Court's own later application of *Zauderer* in *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229 (2010), also focused on remedying misleading advertisements, which was the sole interest invoked by the government.  *Id*. at 249.  Given the subject of both cases, it was natural for the Court to express the rule in such terms.  The language could have been simply descriptive of the circumstances to which the Court applied its new rule, or it could have aimed to preclude any application beyond those circumstances.  Cf. *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399 (1821) (Marshall, C.J., warning against extending general language of an opinion into different contexts), quoted in *Arkansas Game and Fish Comm'n v. United States*, 133 S. Ct. 511, 520 (2012).

The language with which *Zauderer* justified its approach, however, sweeps far more broadly than the interest in remedying deception.  After recounting the elements of *Central Hudson*, *Zauderer* rejected that test as unnecessary in light of the "material differences between disclosure requirements and outright prohibitions on speech."  *Zauderer*, 471 U.S. at 650.  Later in the opinion, the Court observed that "the First Amendment interests implicated by disclosure requirements are substantially weaker than those at stake when speech is actually suppressed."  *Id*. at 652 n.14.  After noting that the disclosure took the form of "purely factual and uncontroversial information about the terms under which [the] services will be available," the Court characterized the speaker's interest as "minimal":  "Because the extension of First Amendment protection to commercial speech is justified principally by the value to consumers of the information such speech provides, appellant's constitutionally protected interest in *not* providing any particular factual information in his advertising is minimal."  *Id*. at 651 (citation omitted).  All told, *Zauderer*'s characterization of the speaker's interest in opposing forced disclosure of such information as "minimal"

seems inherently applicable beyond the problem of deception, as other circuits have found. See, e.g., *N.Y. State Rest. Ass'n v. N.Y. City Bd. of Health*, 556 F.3d 114, 133 (2d Cir. 2009); *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 310 (1st Cir. 2005) (Torruella, J.); *id.* at 316 (Boudin, C.J. & Dyk, J.); *id.* at 297-98 (per curiam) (explaining that the opinion of Chief Judge Boudin and Judge Dyk is controlling on the First Amendment issue); *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 113-15 (2d Cir. 2001).

To the extent that other cases in this circuit may be read as holding to the contrary and limiting *Zauderer* to cases in which the government points to an interest in correcting deception, we now overrule them.[1] See, e.g., *Nat'l Ass'n of Mfrs. v. SEC*, 748 F.3d 359, 370-71 (D.C. Cir. 2014); *Nat'l Ass'n of Mfrs. v. NLRB*, 717 F.3d 947, 959 n.18 (D.C. Cir. 2013); *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1214 (D.C. Cir. 2012).

In applying *Zauderer*, we first must assess the adequacy of the interest motivating the country-of-origin labeling scheme. AMI argues that, even assuming *Zauderer* applies here, the government has utterly failed to show an adequate interest in making country-of-origin information available to consumers. AMI disparages the government's interest as simply being that of satisfying consumers' "idle curiosity."

---

[1] Judge Henderson in her separate dissent criticizes the now-vacated panel opinion for stating the panel's view that the language of *R.J. Reynolds* and *National Association of Manufacturers v. NLRB* limiting *Zauderer* to instances of deception-correction did not constitute holdings. Whatever the merits of that view, the panel recognized that other judges might reasonably take the contrary view and accordingly called for the court to consider the scope of *Zauderer* en banc, a call to which the court responded affirmatively. The present opinion is the consequence.

Counsel for AMI acknowledged during oral argument that her theory would as a logical matter doom the statute, "if the only justification that Congress has offered is the justification that it offered here . . . ." Oral Argument Tr. 18, *American Meat Institute v. USDA*, No. 13-5281 (D.C. Cir. May 19, 2014) (en banc).

Beyond the interest in correcting misleading or confusing commercial speech, *Zauderer* gives little indication of what type of interest might suffice. In particular, the Supreme Court has not made clear whether *Zauderer* would permit government reliance on interests that do not qualify as substantial under *Central Hudson*'s standard, a standard that itself seems elusive. Cf. *Kansas v. United States*, 16 F.3d 436, 443 (D.C. Cir. 1994) ("Indeed, the pedestrian nature of those interests affirmed as substantial calls into question whether *any* governmental interest—except those already found trivial by the Court—could fail to be substantial."); *Board of Trustees v. Fox*, 492 U.S. 469, 475 (1989) (finding a ban applied to "Tupperware parties" in a college dormitory to be permissibly based on the state's substantial interests in "promoting an educational rather than commercial atmosphere on SUNY's campuses, promoting safety and security, preventing commercial exploitation of students, and preserving residential tranquility"). But here we think several aspects of the government's interest in country-of-origin labeling for food combine to make the interest substantial: the context and long history of country-of-origin disclosures to enable consumers to choose American-made products; the demonstrated consumer interest in extending country-of-origin labeling to food products; and the individual health concerns and market impacts that can arise in the event of a food-borne illness outbreak. Because the interest motivating the 2013 rule is a substantial one, we need not decide whether a lesser interest could suffice under *Zauderer*.

10

Country-of-origin information has an historical pedigree that lifts it well above "idle curiosity." History can be telling. In *Burson v. Freeman*, 504 U.S. 191, 211 (1992) (plurality opinion), for example, the Court, applying strict scrutiny to rules banning electioneering within a 100-foot zone around polling places, found an adequate justification in a "long history, a substantial consensus, and simple common sense." See also *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995) (citing *Burson* for the same proposition). And country-of-origin label mandates indeed have a "long history." Congress has been imposing similar mandates since 1890, giving such rules a run just short of 125 years. See Tariff Act of 1890, ch. 1244, § 6, 26 Stat. 567, 613; *United States v. Ury*, 106 F.2d 28, 29 (2d Cir. 1939); see also Tariff Act of 1930, ch. 497, § 304, 46 Stat. 590, 687 (current version at 19 U.S.C. § 1304); Wool Products Labeling Act of 1939, as amended by Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, §§ 304-05, 98 Stat. 1585, 1604 (current version at 15 U.S.C. § 68b(a)(2)(D)); Fur Products Labeling Act, ch. 298, § 4, 65 Stat. 175, 177-78 (1951) (current version at 15 U.S.C. § 69b(2)(F)); Textile Fiber Products Identification Act, Pub. L. No. 85-897, § 4, 72 Stat. 1717, 1719 (1958) (current version at 15 U.S.C § 70b(b)(4)-(5)); American Automobile Labeling Act, Pub. L. No. 102-388, § 210, 106 Stat. 1556 (1992) (current version at 49 U.S.C. § 32304).

The history relied on in *Burson* was (as here) purely of legislative action, not First Amendment rulings by the judiciary. But just as in *Burson*, where "[t]he majority of [the] laws were adopted originally in the 1890s," 504 U.S. at 208, the "time-tested consensus" that consumers want to know the geographical origin of potential purchases has material weight in and of itself, *id*. at 206. The Congress that extended country-of-origin mandates to food did so against a historical

backdrop that has made the value of this particular product information to consumers a matter of common sense.

Supporting members of Congress identified the statute's purpose as enabling customers to make informed choices based on characteristics of the products they wished to purchase, including United States supervision of the entire production process for health and hygiene. 148 Cong. Rec. 5491-92 (2002) (statement of Rep. Hooley, co-sponsor of country-of-origin amendment to 2002 Farm Bill) (mentioning "buy American" and safety interests motivating consumers' desire for country-of-origin information); *id.* at 5493 (statement of Rep. Wu) (same); see also 153 Cong. Rec. 20,847 (2007) (statement of Rep. Bono) (calling country-of-origin labeling "a matter of public safety"). Some expressed a belief that with information about meat's national origin, many would choose American meat on the basis of a belief that it would in truth be better. See, e.g., 148 Cong. Rec. 5492 (2002) (statement of Rep. Hooley); *id.* (statement of Rep. Thune); *id.* (statement of Rep. Wu). Even though the production steps abroad for food imported into the United States are to a degree subject to U.S. government monitoring, see Brief for United Mexican States as Amicus Curiae at 4-6, it seems reasonable for Congress to anticipate that many consumers may prefer food that had been continuously under a particular government's direct scrutiny.

Some legislators also expressed the belief that people would have a special concern about the geographical origins of what they eat. This is manifest in anecdotes appearing in the legislative record, such as the collapse of the cantaloupe market when some imported cantaloupes proved to be contaminated and consumers were unable to determine whether the melons on the shelves had come from that country. See 148 Cong. Rec. 5492 (2002) (statement of Rep. Thurman). Of course the anecdote more broadly suggests the

utility of these disclosures in the event of any disease outbreak known to have a specific country of origin, foreign or domestic.

The record is further bolstered by surveys AMS reviewed, such as one indicating that 71-73 percent of consumers would be willing to pay for country-of-origin information about their food. Mandatory Country of Origin Labeling, 68 Fed. Reg. 61,944, 61,955/2 (proposed Oct. 30, 2003) (to be codified at 7 C.F.R. pt. 60) ("2003 proposed rule"); see also 2013 rule, 78 Fed. Reg. at 31,375/3 (noting that commenters had referred to a study showing consumer willingness to pay). The AMS quite properly noted the vulnerabilities in such data. Most obvious is the point that consumers tend to overstate their willingness to pay; after all, the data sound possibly useful, and giving a "Yes" answer on the survey doesn't cost a nickel. 2003 proposed rule, 68 Fed. Reg. at 61,955/3; see also 2013 rule, 78 Fed. Reg. at 31,377/3 (reiterating that the agency found no available consumer surveys using sufficiently complex modeling techniques). But such studies, combined with the many favorable comments the agency received during all of its rulemakings, reinforce the historical basis for treating such information as valuable. 2013 rule, 78 Fed. Reg. at 31,376/1-2.

In light of the legislators' arguments, read in the context of country-of-origin labeling's long history, we need not consider to what extent a mandate reviewed under *Zauderer* can rest on "other suppositions," as opposed to "the precise interests put forward by the State." See *Edenfield v. Fane*, 507 U.S. 761, 768 (1993). The statute itself mandates country-of-origin labels, 2013 rule, 78 Fed. Reg. at 31,377/2, and AMI makes no claim that the agency's exercises of its discretion are of constitutional moment (and we are reviewing only AMI's constitutional claim, not the separate statutory interpretation issue it raised before the panel). As "[t]he

*Chenery* doctrine [*SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943)] has no application to" agency actions required by statute, *Morgan Stanley Capital Group Inc. v. Public Utility Dist. No. 1*, 554 U.S. 527, 544-45 (2008), the "precise interests" served by the 2013 rule are simply those advanced by Congress in adopting the statute.

We pause to note the implications of a rule under which a statute's constitutionality could be doomed by agency fumbling (whether deliberate or accidental) of perfectly adequate legislative interests properly stated by congressional proponents. Such a rule would allow the executive to torpedo otherwise valid legislation simply by failing to cite to the court the interests on which Congress relied. And it would allow the next administration to revive the legislation by citing those interests. We do not think the constitutionality of a statute should bobble up and down at an administration's discretion.

In any event, the agency has sufficiently invoked the interests served by the statute, both during the rulemaking, 2013 rule, 78 Fed. Reg. at 31,377/2 ("This rule . . . is the result of statutory obligations to implement the [country-of-origin] provisions of the 2002 and 2008 Farm Bills."); *id*. at 31,370/1, and in litigation, Federal Appellees' Br. 25, 26, *American Meat Institute v. USDA*, No. 13-5281 (D.C. Cir. 2014), and has certainly not disclaimed those interests, see Oral Argument Tr. 51-52, *American Meat Institute v. USDA*, No. 13-5281 (D.C. Cir. May 19, 2014) (en banc).

Finally, agency statements (from prior rulemakings) claiming that country-of-origin labeling serves no food safety interest are not inconsistent with any of the government's litigation positions here. Simply because the agency believes it has other, superior means to protect food safety doesn't delegitimize a congressional decision to empower consumers

to take possible country-specific differences in safety practices into account. Nor does such an agency belief undercut the economy-wide benefits of confining the market impact of a disease outbreak.

Having determined that the interest served by the disclosure mandate is adequate, what remains is to assess the relationship between the government's identified means and its chosen ends. Under *Central Hudson*, we would determine whether "the regulatory technique [is] in proportion to [the] interest," an inquiry comprised of assessing whether the chosen means "directly advance[s] the state interest involved" and whether it is narrowly tailored to serve that end. *Central Hudson*, 447 U.S. at 564; *Fox*, 492 U.S. at 480. *Zauderer*'s method of evaluating fit differs in wording, though perhaps not significantly in substance, at least on these facts.

When the Supreme Court has analyzed *Central Hudson*'s "directly advance" requirement, it has commonly required evidence of a measure's effectiveness. See *Edenfield*, 507 U.S. at 770-71. But as the Court recognized in *Zauderer*, such evidentiary parsing is hardly necessary when the government uses a disclosure mandate to achieve a goal of informing consumers about a particular product trait, assuming of course that the reason for informing consumers qualifies as an adequate interest. 471 U.S. at 650; see also *Milavetz*, 559 U.S. at 249 (referring to *Zauderer* as providing for "less exacting scrutiny"). *Zauderer*, like the doctrine of *res ipsa loquitur*, identifies specific circumstances where a party carries part of its evidentiary burden in a way different from the customary one. See, e.g., *Bell v. May Dep't Stores Co.*, 866 F.2d 452, 455-56 (D.C. Cir. 1989). There, a plaintiff proves negligence by meeting the specified criteria (such as proving the defendant's exclusive control over the agency causing the injury); here, by acting only through a reasonably crafted disclosure mandate, the government meets its burden

of showing that the mandate advances its interest in making the "purely factual and uncontroversial information" accessible to the recipients. Of course to match *Zauderer* logically, the disclosure mandated must relate to the good or service offered by the regulated party, a link that in *Zauderer* itself was inherent in the facts, as the disclosure mandate necessarily related to such goods or services. See *Zauderer*, 471 U.S. at 651 (acknowledging that the disclosure mandate involved "purely factual and uncontroversial information about the terms under which [the] services will be available"). For purposes of this case, we need not decide on the precise scope or character of that relationship.

The self-evident tendency of a disclosure mandate to assure that recipients get the mandated information may in part explain why, where that is the goal, many such mandates have persisted for decades without anyone questioning their constitutionality. In this long-lived group have been not only country-of-origin labels but also many other routine disclosure mandates about product attributes, including, for instance, disclosures of fiber content, 16 C.F.R. pt. 303, care instructions for clothing items, 16 C.F.R. pt. 423, and listing of ingredients, 21 C.F.R. § 101.4.

Notwithstanding the reference to "narrow tailoring," the Court has made clear that the government's burden on the final *Central Hudson* factor is to show a "reasonable fit," see *Fox*, 492 U.S. at 480, or a "reasonable proportion," see *Edenfield*, 507 U.S. at 767, between means and ends. To the extent that the government's interest is in assuring that consumers receive particular information (as it plainly is when mandating disclosures that correct deception), the means-end fit is self-evidently satisfied when the government acts only through a reasonably crafted mandate to disclose "purely factual and uncontroversial information" about attributes of the product or service being offered. In other words, this

particular method of achieving a government interest will almost always demonstrate a reasonable means-ends relationship, absent a showing that the disclosure is "unduly burdensome" in a way that "chill[s] protected commercial speech," *id*. at 651.

Thus, to the extent that the pre-conditions to application of *Zauderer* warrant inferences that the mandate will "directly advance" the government's interest and show a "reasonable fit" between means and ends, one could think of *Zauderer* largely as "an *application* of *Central Hudson*, where several of *Central Hudson*'s elements have already been established." AMI Supplemental Br. at 9.

In this case, the criteria triggering the application of *Zauderer* are either unchallenged or substantially unchallenged. The decision requires the disclosures to be of "purely factual and uncontroversial information" about the good or service being offered. *Zauderer*, 471 U.S. at 651. AMI does not contest that country-of-origin labeling qualifies as factual, and the facts conveyed are directly informative of intrinsic characteristics of the product AMI is selling.

As to whether it is "controversial," AMI objected to the word "slaughter" in its reply brief. Though it seems a plain, blunt word for a plain, blunt action, we can understand a claim that "slaughter," used on a product of any origin, might convey a certain innuendo. But we need not address such a claim because the 2013 rule allows retailers to use the term "harvested" instead, 78 Fed. Reg. at 31,368/2, and AMI has posed no objection to that. And AMI does not disagree with the truth of the facts required to be disclosed, so there is no claim that they are controversial in that sense.

We also do not understand country-of-origin labeling to be controversial in the sense that it communicates a message

that is controversial for some reason other than dispute about simple factual accuracy. Cf. *Nat'l Ass'n of Mfrs. v. SEC*, 748 F.3d at 371 (questioning but not deciding whether the information mandated was factual and uncontroversial). Leaving aside the possibility that some required factual disclosures could be so one-sided or incomplete that they would not qualify as "factual and uncontroversial," cf. *Nat'l Ass'n of Mfrs. v. NLRB*, 717 F.3d at 958 (describing one party's argument that disclosures were "one-sided . . . favoring unionization"), country-of-origin facts are not of that type. AMI does not suggest anything controversial about the message that its members are required to express.

Nor does the mandate run afoul of the Court's warning that *Zauderer* does not leave the state "free to require corporations to carry the messages of third parties, where the messages themselves are biased against or are expressly contrary to the corporation's views." *Pacific Gas & Electric Co. v. Public Utilities Commission*, 475 U.S. 1, 15-16 n.12 (1986) (plurality opinion).

Finally, though it may be obvious, we note that *Zauderer* cannot justify a disclosure so burdensome that it essentially operates as a restriction on constitutionally protected speech, as in *Ibanez v. Florida Department of Business and Professional Regulation*, 512 U.S. 136, 146-47 (1994), where a required disclaimer was so detailed that it "effectively rule[d] out notation of the 'specialist' designation on a business card or letterhead, or in a yellow pages listing." Nor can it sustain mandates that "chill[] protected commercial speech." *Zauderer*, 471 U.S. at 651. AMI has made no claim of either of these consequences.

Accordingly we answer affirmatively the general question of whether "government interests in addition to correcting deception," *American Meat Inst. v. USDA*, 746 F.3d 1065,

1073 n.1 (D.C. Cir. 2014), can be invoked to sustain a disclosure mandate under *Zauderer*, and specifically find the interests invoked here to be sufficient. We reinstate the judgment and leave untouched the opinion of the panel with respect to the remaining issues on appeal.

*So ordered*.

ROGERS, *Circuit Judge*, concurring in part. Although I join much of the court's opinion, I write separately to disassociate myself from the suggested reformulation of the separate standards for First Amendment protection of commercial speech in *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985), and *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980). The *en banc* court defined the issue before it as whether the commercial disclosure standard of *Zauderer* applies only when the government's interest is in preventing deception. *See* Order (Apr. 4, 2014). Because the court holds *Zauderer* is not so limited, and that the governmental interest is substantial, *see* Op. at 6–14, there is no occasion today to speak more broadly. Viewing *Zauderer* as simply an application of *Central Hudson* to special circumstances, as AMI has suggested to the *en banc* court, *see* AMI Supp. Br. 8–11, finds support in neither Supreme Court precedent nor the precedent of this court or our sister circuits. Although the *en banc* court stops short of endorsing this reformulation, stating only that "one could think of *Zauderer* largely as an *application* of *Central Hudson*," Op. at 16 (citation and internal quotation mark omitted), blurring the lines between the standards portends unnecessary confusion absent further instruction from the Supreme Court.

The reformulation of the standards (as well as the dissent's approach, *see* dissenting opinion of Judge Brown, joined by Judge Henderson, at 15–17), appears to contravene the Supreme Court's rationale in *Zauderer* and the purposes served by First Amendment protection of commercial speech. Under the *Central Hudson* standard, in reviewing *restrictions* on lawful, non-misleading commercial speech, the Supreme Court instructed that a court must determine "whether the asserted governmental interest is substantial[,] . . . whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest." 447 U.S. at 566. But in *Zauderer*, although the Court

began its analysis discussing both speech restrictions and a disclosure requirement by referring to the standard under *Central Hudson*, *see* 471 U.S. at 638, when the Court analyzed the challenged *disclosure* requirement it rejected the argument that the government needed to show direct advancement of its interest, as review under *Central Hudson* would have required, *see id.* at 650; *Central Hudson*, 447 U.S. at 566. The Court instructed in analyzing the disclosure requirement that it suffices instead to determine whether the "disclosure requirements are reasonably related to the State's interest in preventing deception of consumers." *Zauderer*, 471 U.S. at 651. The Court explained that "disclosure requirements trench much more narrowly on an advertiser's interests than do flat prohibitions on speech," *id.*, indicating thereby that the Court was not tracing a shortcut through *Central Hudson* but defining a category in which the interests at stake were less threatened. In applying *Zauderer*, the Court in *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229 (2010), concluded that mandated disclosure requirements for professionals assisting consumers with bankruptcy were subject to the "less exacting scrutiny described in *Zauderer*," *id.* at 249, and did not violate the First Amendment, *see id.* at 249–50, again treating *Zauderer* as establishing a separate level of inquiry. *See also id.* at 255 (Thomas, J., concurring in part and concurring in the judgment) (describing *Zauderer* as "a still lower standard of scrutiny").

Fairly understood, the Supreme Court's analysis of the disclosure requirement in *Zauderer* does not reformulate the *Central Hudson* standard but rather establishes a different standard based on the "material differences between disclosure requirements and outright prohibitions on speech." 471 U.S. at 650. Similarly, in *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996), the Court explained that "[w]hen a State regulates commercial messages to protect consumers from misleading, deceptive, or aggressive sales practices, or requires the

disclosure of beneficial consumer information, the purpose of its regulation is consistent with the reasons for according constitutional protection to commercial speech and therefore justifies less than strict review." *Id.* at 501 (plurality opinion). This is consistent with the Court's longstanding focus, in the commercial speech area, on the "consumer's interest in the free flow of commercial information," *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 763 (1976), and its "indispensable" role in "the proper allocation of resources in a free enterprise system," *id*. at 765. As our sister circuits have held in applying the *Zauderer* standard, the government's imposition of a commercial disclosure requirement involving "accurate, factual, commercial information does not offend the core First Amendment values of promoting efficient exchange of information or protecting individual liberty interests." *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 114 (2d Cir. 2001).

> Such disclosure furthers, rather than hinders, the First Amendment goal of the discovery of truth and contributes to the efficiency of the "marketplace of ideas." Protection of the robust and free flow of accurate information is the principal First Amendment justification for protecting commercial speech, and requiring disclosure of truthful information promotes that goal. In such a case, then, less exacting scrutiny is required than where truthful, nonmisleading commercial speech is restricted.

*Id*. (citations omitted); *see also Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 316 (1st Cir. 2005) (controlling opinion of Boudin, C.J., and Dyk, J.); Robert Post, *The Constitutional Status of Commercial Speech*, 48 U.C.L.A. L. REV. 1, 26–28 (2000).

The *en banc* court's holding that *Zauderer* applies to

government disclosure interests beyond preventing deception acknowledges that the First Amendment values underlying protection of commercial speech naturally lead to a distinction between disclosures and restrictions, but it appears not to acknowledge the full implications of the distinction: *Zauderer*'s conceptual framework is what drives not only its application to disclosures serving other governmental interests, but also its less rigorous level of scrutiny. The dissent's analysis fails to acknowledge that *Zauderer*'s holding with regard to the disclosure requirement rested primarily on this difference between disclosures and restrictions, not on the risk of deception. Yet this court and our sister circuits have understood the Supreme Court to have established distinct standards for analyzing First Amendment challenges to government-imposed commercial restrictions and disclosures. In *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1212 (D.C. Cir. 2012), the court distinguished *Central Hudson* review from *Zauderer* and likened the latter to rational-basis review. In *Spirit Airlines, Inc. v. DOT*, 687 F.3d 403 (D.C. Cir. 2012), the court stated that "[d]isclosure requirements . . . are not the kind of limitations that the Court refers to when invoking the *Central Hudson* standard of review," *id.* at 413, and applied *Zauderer* as a less stringent standard, *see id.* at 411–13. Indeed, the understanding that *Central Hudson* and *Zauderer* involve distinct standards is evident from the *en banc* order in the instant case. *See* Order (Apr. 4, 2014) (instructing the parties to address "[w]hether, under the First Amendment, judicial review of mandatory disclosure of 'purely factual and uncontroversial' commercial information, compelled for reasons other than preventing deception, can properly proceed under *Zauderer . . .*, or whether such compelled disclosure is subject to review under *Central Hudson . . .*"). The opinions of our sister circuits are to the same effect, that restrictions and disclosures are factually distinct and, due to their different impacts on First Amendment interests, are governed by different standards. *See, e.g.*, *Disc. Tobacco City*

*& Lottery, Inc. v. United States*, 674 F.3d 509, 554–55 (6th Cir. 2012) (controlling opinion of Stranch, J.); *N.Y. State Rest. Ass'n v. N.Y. City Bd. of Health*, 556 F.3d 114, 132–33 (2d Cir. 2009); *Pharm. Care Mgmt. Ass'n*, 429 F.3d at 316 (1st Cir.); *Nat'l Elec. Mfrs. Ass'n*, 272 F.3d at 113–15 (2d Cir.). *But see United States v. Wenger*, 427 F.3d 840, 849 (10th Cir. 2005).

Even assuming that AMI's proposed reformulation of the *Central Hudson* and *Zauderer* standards has little impact on the outcome of the First Amendment challenge here, blurring the lines between the two standards may sow confusion where, for example, the focus is not on the adequacy of the government interest, as here, but instead on the evidentiary support for, or the "fit" of, the disclosure requirement. Absent further instruction from the Supreme Court or consideration of the question when it is necessary to our decision, the court has no occasion to veer from the Supreme Court's articulation of the standards in *Central Hudson* and *Zauderer*.

KAVANAUGH, *Circuit Judge*, concurring in the judgment: May the U.S. Government require an imported Chinese-made product to be labeled "Made in China"? For many readers, the question probably answers itself: Yes. This case requires us to explain why that is so, in particular why such a requirement passes muster under the First Amendment. The precise First Amendment issue before us concerns a federal law that requires country-of-origin labels for meat and other food products. Country-of-origin labels are of course familiar to American consumers. Made in America. Made in Mexico. Made in China. And so on. For many decades, Congress has mandated such country-of-origin labels for a variety of products. I agree with the majority opinion that the First Amendment does not bar those longstanding and commonplace country-of-origin labeling requirements.

As a starting point, all agree that the First Amendment imposes stringent limits on the Government's authority to either restrict or compel speech by private citizens and organizations. *See Texas v. Johnson*, 491 U.S. 397 (1989); *Wooley v. Maynard*, 430 U.S. 705 (1977); *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943). This case involves commercial speech. The First Amendment protects commercial speech, and regulations of commercial speech are analyzed under the Supreme Court's *Central Hudson* framework. To justify laws regulating commercial speech, the Government must (i) identify a substantial governmental interest and (ii) demonstrate a sufficient fit between the law's requirements and that substantial governmental interest. *See Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 566 (1980).

I will address in turn how those two basic *Central Hudson* requirements apply to this case.

First, under *Central Hudson*, the Government must identify a substantial governmental interest that is served by the law in question. Since its decision in *Central Hudson*, the Supreme Court has not stated that something less than a "substantial" governmental interest would justify either a restriction on commercial speech or a compelled commercial disclosure. And likewise, the majority opinion today does not say that a governmental interest that is less than substantial would suffice to justify a compelled commercial disclosure.

What interests qualify as sufficiently substantial to justify the infringement on the speaker's First Amendment autonomy that results from a compelled commercial disclosure? Here, as elsewhere in First Amendment free-speech law, history and tradition are reliable guides. *See Brown v. Entertainment Merchants Association*, 131 S. Ct. 2729, 2734 (2011) ("a long (if heretofore unrecognized) tradition of proscription" may sometimes justify restrictions on speech); *Republican Party of Minnesota v. White*, 536 U.S. 765, 785 (2002) ("It is true that a universal and long-established tradition of prohibiting certain conduct creates a strong presumption that the prohibition is constitutional.") (internal quotation marks omitted); *Burson v. Freeman*, 504 U.S. 191, 200-06 (1992) (plurality opinion) (history of state restrictions on electioneering supported conclusion that such a restriction was necessary to serve state's compelling interests); *see also McIntyre v. Ohio Elections Commission*, 514 U.S. 334, 375-78 (1995) (Scalia, J., dissenting) ("Where the meaning of a constitutional text (such as 'the freedom of speech') is unclear, the widespread and long-accepted practices of the American people are the best indication of what fundamental beliefs it was intended to enshrine."). The Government has long required commercial disclosures to prevent consumer deception or to ensure consumer health or safety. Those interests explain and justify the compelled commercial

disclosures that are common and familiar to American consumers, such as nutrition labels and health warnings. *See, e.g.*, *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1211 (D.C. Cir. 2012) (noting that there was no dispute about Congress's authority to require health warnings on cigarette packages).

But the Government cannot advance a traditional anti-deception, health, or safety interest in this case because a country-of-origin disclosure requirement obviously does not serve those interests. Rather, the Government broadly contends that it has a substantial interest in "providing consumers with information." Tr. of Oral Arg. at 41. For *Central Hudson* purposes, however, it is plainly not enough for the Government to say simply that it has a substantial interest in giving consumers information. After all, that would be true of any and all disclosure requirements. That circular formulation would drain the *Central Hudson* test of any meaning in the context of compelled commercial disclosures. *See R.J. Reynolds*, 696 F.3d at 1221. Not surprisingly, governments (federal, state, and local) would love to have such a free pass to spread their preferred messages on the backs of others. But as the Second Circuit has stated, "Were consumer interest alone sufficient, there is no end to the information that states could require manufacturers to disclose about their production methods." *International Dairy Foods Association v. Amestoy*, 92 F.3d 67, 74 (2d Cir. 1996). Some consumers might want to know whether their U.S.-made product was made by U.S. citizens and not by illegal immigrants. Some consumers might want to know whether a doctor has ever performed an abortion. Some consumers might want to know the political affiliation of a business's owners. These are not far-fetched hypotheticals, particularly at the state or local level. Do such consumer desires suffice to justify compelled commercial

disclosures of such information on a product or in an advertisement?  I think not, and history and tradition provide no support for that kind of free-wheeling government power to mandate compelled commercial disclosures.  I agree with this Court's rejection of such an undifferentiated governmental interest in *R.J. Reynolds*.  And I agree with the Second Circuit's statement in *Amestoy* that "consumer curiosity alone is not a strong enough state interest" to sustain a compelled commercial disclosure.  *Id.*  The majority opinion today properly does not embrace the Government's broad argument.

Although the Government's broad argument is meritless, country-of-origin labeling is justified by the Government's historically rooted interest in supporting American manufacturers, farmers, and ranchers as they compete with foreign manufacturers, farmers, and ranchers.  Since the early days of the Republic, numerous U.S. laws have sought to further that interest, sometimes overtly and sometimes subtly.  Although economists debate whether various kinds of protectionist legislation help U.S. consumers and the overall U.S. economy, there is no doubt that Congress has long sought to support and promote various U.S. industries against their foreign competition.  How is that interest implicated by country-of-origin labeling?  Country-of-origin labeling, it is widely understood, causes many American consumers (for a variety of reasons) to buy a higher percentage of American-made products, which in turn helps American manufacturers, farmers, and ranchers as compared to foreign manufacturers, farmers, and ranchers.  That is why Congress has long mandated country-of-origin disclosures for certain products. *See, e.g.*, *United States v. Ury*, 106 F.2d 28, 29 (2d Cir. 1939) (purpose of early country-of-origin labeling requirements "was to apprise the public of the foreign origin and thus to confer an advantage on domestic producers of competing

goods"). That historical pedigree is critical for First Amendment purposes and demonstrates that the Government's interest here is substantial. The majority opinion properly relies on the history of country-of-origin labeling laws as a basis for finding that the Government has a substantial interest in this case.

That said, one wrinkle in this case is whether the Government has actually asserted an interest in supporting American farmers and ranchers in order to justify this country-of-origin labeling requirement for meat and other food products. Whether the Government has asserted such an interest matters because *Central Hudson* requires that the Government articulate the interests it seeks to advance. *See Edenfield v. Fane*, 507 U.S. 761, 768 (1993). And the Executive Branch has refrained during this litigation from expressly articulating its clear interest in supporting American farmers and ranchers in order to justify this law, apparently because of the international repercussions that might ensue. But the interest here is obvious, even if unarticulated by the Executive Branch for reasons of international comity. And more to the point for *Central Hudson* purposes, Members of Congress did articulate the interest in supporting American farmers and ranchers when Congress enacted this country-of-origin labeling law. *See, e.g.*, 148 Cong. Rec. 5492-93, 6884-85 (2002); *see also id.* at 1181. And Congress's articulation of the interest suffices under *Central Hudson*. *Cf. Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 662 (1994) (looking to statutory findings and legislative history to discern the governmental interests served); *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 493 (1981) (plurality opinion) (looking to text of city's ordinance to discern the governmental interests served).

In short, the Government has a substantial interest in this case in supporting American farmers and ranchers against their foreign competitors.

The second question under *Central Hudson* concerns the fit between the disclosure requirement and the Government's interest – as plaintiff AMI succinctly puts it, whether the disclosure requirement is "tailored in a reasonable manner." AMI Supplemental Br. at 16 (quoting *Edenfield*, 507 U.S. at 767); *see also National Association of Manufacturers v. SEC*, 748 F.3d 359, 372 (D.C. Cir. 2014) ("must be a reasonable fit between means and ends" under *Central Hudson*) (internal quotation marks omitted).

As I read it, the Supreme Court's decision in *Zauderer* applied the *Central Hudson* "tailored in a reasonable manner" requirement to compelled commercial disclosures. At the outset of its opinion, the *Zauderer* Court described the general *Central Hudson* framework in detail. And then the Court stated: "we must apply the teachings of these cases," including *Central Hudson*, to the three separate state regulations of attorney advertising at issue, including "disclosure requirements relating to the terms of contingent fees." *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 638 (1985). In applying the teachings of *Central Hudson* to the state disclosure requirement, the *Zauderer* Court required that such mandatory disclosures be "purely factual," "uncontroversial," not "unduly burdensome," and "reasonably related to" the Government's interest. *Id.* at 651. So *Zauderer* is best read simply as an application of *Central Hudson*, not a different test altogether. In other words, *Zauderer* tells us what *Central Hudson*'s "tailored in a reasonable manner" standard means in the context of compelled commercial disclosures: The disclosure must be purely factual, uncontroversial, not

unduly burdensome, and reasonably related to the Government's interest.[1]

It is important to underscore that those *Zauderer* fit requirements are far more stringent than mere rational basis review. When the Supreme Court applies rational basis review, it does not attach a host of requirements of the kind prescribed by *Zauderer*. Rational basis review is extremely deferential and in this context would undoubtedly tolerate government mandates of moral or policy-laden messages, of controversial messages, of burdensome labels, of disclosures that are only indirectly related to the Government's interests. *Zauderer* tolerates none of that. *Zauderer* tightly limits mandatory disclosures to a very narrow class that meets the various *Zauderer* requirements. So to the extent that some courts, advocates, and commentators have portrayed a choice between the "tough *Central Hudson* standard" and the "lenient *Zauderer* standard," I see that as a false choice. As I read it, *Zauderer* applied and elaborated on *Central Hudson*'s "tailored in a reasonable manner" requirement and established a demanding set of requirements that the Government must

---

[1] To state what is probably obvious, the compelled disclosure must be a disclosure about the product or service in question to be justified under *Central Hudson* and *Zauderer*. The First Amendment does not tolerate a government effort to compel disclosures unrelated to the product or service – for example, a compelled disclosure on all food packages (not just cigarette packages) that cigarette smoking causes cancer. The majority opinion, as I read it, agrees with that principle. *See* Maj. Op. at 15 ("Of course to match *Zauderer* logically, the disclosure mandated must relate to the good or service offered by the regulated party . . . ."); *see also Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651 (1985) (state required an attorney's advertising to disclose "information about the terms under which his services will be available").

meet to justify a compelled commercial disclosure. The majority opinion properly does not equate *Zauderer* to mere rational basis review and properly insists that the mandatory disclosure here must meet all of the various *Zauderer* requirements. And the majority opinion and I agree on the following: To justify a compelled commercial disclosure, assuming the Government articulates a substantial governmental interest, the Government must show that the disclosure is purely factual, uncontroversial, not unduly burdensome, and reasonably related to the Government's interest.[2]

In this case, as the majority opinion properly concludes, those stringent *Zauderer* fit requirements are met. The country-of-origin labeling requirement at issue here is purely factual, is not unduly burdensome, and as explained above is

---

[2] Although I agree with the results and most of the reasoning of *R.J. Reynolds* and *National Association of Manufacturers*, I disagree with those cases' description of *Zauderer* as mere rational basis review. *See National Association of Manufacturers v. SEC*, 748 F.3d 359, 370-71 (D.C. Cir. 2014) (characterizing *Zauderer* as "rational basis review"); *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1212 (D.C. Cir. 2012) (*Zauderer* review is "akin to rational-basis review"). That description of *Zauderer* in turn led those cases to apply the *Central Hudson* test rather than the *Zauderer* test to the compelled commercial disclosures at issue in those cases. To reiterate, however, I see the choice between *Zauderer* and *Central Hudson* as a false choice because it is based on a mistaken premise, in my view. *Zauderer* applied *Central Hudson*'s fit prongs to this compelled commercial speech context and set forth a variety of stringent requirements far more demanding than mere rational basis review. The majority opinion today properly recognizes that *Zauderer* did not embrace mere rational basis review, and the majority opinion thus disavows that aspect of *R.J. Reynolds* and *National Association of Manufacturers* without disturbing the results of those cases.

reasonably related to the Government's longstanding interest in supporting American farmers and ranchers. To be sure, determining whether a disclosure is "uncontroversial" may be difficult in some compelled commercial speech cases, in part because it is unclear how we should assess and what we should examine to determine whether a mandatory disclosure is controversial. But regardless of how the "uncontroversial" requirement might play out in other cases, the issue poses little difficulty here. Unlike the mandated disclosures at issue in *R.J. Reynolds* or *National Association of Manufacturers*, for example, a country-of-origin label cannot be considered "controversial" given the factually straightforward, even-handed, and readily understood nature of the information, as well as the historical pedigree of this specific kind of disclosure requirement. *Cf. National Association of Manufacturers*, 748 F.3d at 371 (disclosure requirement that in essence compelled "an issuer to confess blood on its hands"); *R.J. Reynolds*, 696 F.3d at 1216-17 (disclosure requirements that compelled the display of "inflammatory images" and constituted "unabashed attempts to evoke emotion" and "browbeat customers").

\* \* \*

For those reasons, I would uphold this country-of-origin labeling requirement. As I read it, the majority opinion is consistent with my analysis. But I thought it important to spell out each step of my analysis in greater detail. Bottom line: I agree with the majority opinion that we should affirm the judgment of the District Court.

KAREN LeCRAFT HENDERSON, *Circuit Judge*, dissenting:

I agree with Judge Brown that the en banc majority is wrong on the merits and join fully her well-reasoned and compelling dissent. But, for the life of me, I do not understand how we got to the en banc stage in this case. As Judge Brown notes, the original panel "was wrong to contradict *R.J. Reynolds*"—and not solely because the panel was wrong on the merits. *See* Dissent at 11 (citing *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1213 (D.C. Cir. 2012)). The panel was also wrong for the simple reason that its merits decision—whether or not correct—did indeed "contradict" our decision in *R.J. Reynolds* and therefore should not have issued.

One of our court's most fundamental governing principles is the "law of the circuit doctrine" which decrees that the decision of a three-judge panel of the court "is 'the decision of the court.' " *LaShawn v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (en banc) (quoting Revision Notes to 28 U.S.C. § 46). "One three-judge panel, therefore, does not have the authority to overrule another three-judge panel of the court." *Id.* Yet, inexplicably, this is what happened here.

In *R.J. Reynolds,* we vacated the Food and Drug Administration's final rule establishing mandatory graphics warnings on cigarette packages. In so doing, we rejected two ''narrow and well-understood exceptions to the general rule that content based speech regulations—including compelled speech—are subject to strict scrutiny." *R.J. Reynolds*, 696 F.3d at 1212 (quotation marks omitted). The first of the exceptions—which is at issue here—covers " 'purely factual and uncontroversial' disclosures [that] are 'reasonably related to the State's interest in preventing deception of consumers,' provided the requirements are not 'unjustified or unduly burdensome.' " *Id.* (quoting *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985)). In *R.J. Reynolds*, the majority found the *Zauderer* standard

inapplicable to the graphics warning requirement because "by its own terms, *Zauderer*'s holding is limited to cases in which disclosure requirements are 'reasonably related to the State's interest in preventing deception of consumers.' " *Id.* at 1213 (quoting *Zauderer*, 471 U.S. at 651); *see also id.* at 1214 ("[T]he government could not seek review under the lenient *Zauderer* standard absent a showing that the advertisement at issue would likely mislead consumers."); *id.* ("*Zauderer*, *Ibanez*, and *Milavetz* thus establish that a disclosure requirement is only appropriate if the government shows that, absent a warning, there is a . . . danger that an advertisement will mislead consumers."); *id.* at 1214-15 ("[I]n the absence of any congressional findings on the misleading nature of cigarette packaging itself, there is no justification under *Zauderer* for the graphic warnings."); *see also Nat'l Ass'n of Mfrs. v. NLRB*, 717 F.3d 947, 959 n.18 (D.C. Cir. 2013) ("In a footnote to its brief, the Board states that its rule satisfies *Zauderer* . . ., but it does not explain why that decision has even the slightest bearing on this case. Under *Zauderer*, the government may, consistently with the First Amendment, require a party to a commercial transaction to make disclosures in order to prevent that party from deceiving its customers." (citing *R.J. Reynolds*, 696 F.3d at 1215)).

Given its repeated and emphatic reliance on the limited applicability of the *Zauderer* standard—to language involving deception—the *R.J.Reynolds* majority plainly considered the *in*applicability of *Zauderer* as "integral" and "necessary" to its decision," that is to say, a "holding." *See Aamer v. Obama*, 742 F.3d 1023, 1033 (D.C. Cir. 2014) (determination that was "integral to our ultimate disposition of [a] case . . . constitutes binding precedent"); *Cross v. Harris*, 418 F.2d 1095, 1105 n.64 (D.C. Cir. 1969) ("The distinction between holding and dictum . . . turns on whether the court, in stating its opinion on the point, believed it necessary to decide the question or was simply using it by way of illustration of the

case at hand."). Nor was the importance of the majority's reading of *Zauderer* lost on the dissenting judge. *See R.J. Reynolds*, 696 F.3d at 1223 (Rogers, J., dissenting) ("*Even treating Zauderer's 'less exacting scrutiny' as limited to disclosure requirements serving a governmental interest in preventing consumer deception*, the voluminous findings of our own courts . . . are more than adequate to substantiate that interest") (emphasis added); *id.* at 1227 n.6 (noting "[a]s other circuits have recognized, in *Zauderer* the Supreme Court appears simply to have held that a government interest in protecting consumers from possible deception is *sufficient* to support a disclosure requirement—not that this particular interest is *necessary* to support such a requirement" but also concluding "[i]n view of the likelihood of consumer confusion or deception shown here, there is no need to determine whether the scope of *Zauderer* encompasses other government interests") (emphasis in original).

Nonetheless, the original panel here decided that "*Zauderer* is best read as applying not only to mandates aimed at curing deception but also to ones for other purposes, and that neither *Reynolds* nor [*National Association of Manufacturers v. NLRB*, 717 F.3d 947 (D.C. Cir. 2013)] represents a holding to the contrary." *Am. Meat Inst. v. U.S. Dep't of Agric.* (*AMI I*), 746 F.3d 1065, 1073 (D.C. Cir. 2014), *vacated*, 2014 WL 2619836 (D.C. Cir. Apr. 4, 2014) (granting rehearing en banc). I find this conclusion untenable given the centrality of the *R.J. Reynolds* majority's limited reading of *Zauderer*. Because that reading constituted part of *R.J. Reynolds*'s holding, the "power" to overrule it could properly "be exercised only by the full court, either through an *in* [sic] *banc* decision or pursuant to the more informal practice adopted in *Irons v. Diamond*, 670 F.2d 265, 268 n.11 (D.C. Cir. 1981)," *LaShawn*, 87 F.3d at 1395 (citation omitted). The panel nonetheless issued its own decision overruling *R.J. Reynolds*'s *Zauderer* holding instead of either

4

seeking full en banc hearing or inserting a proper *Irons* footnote announcing, if obtained, the en banc court's unanimous endorsement of the opinion.[*]

---

[*]That the panel forewent the *Irons* footnote procedure is not surprising as none of the justifications therefor fits. Our written policy, based on our accumulated case law, sets out four specific—albeit non-exclusive—bases for an *Irons* footnote:

> (1) resolving an apparent conflict in the prior decisions of panels of the court;

> (2) rejecting a prior statement of law which, although arguably dictum, warrants express rejection to avoid future confusion;

> (3) overruling an old or obsolete decision which, although still technically valid as precedent, has plainly been rendered obsolete by subsequent legislation or other developments; and

> (4) overruling a more recent precedent which, due to an intervening Supreme Court decision, or the combined weight of authority from other circuits, a panel is convinced is clearly an incorrect statement of current law.

Policy Statement on En Banc Endorsement of Panel Decisions at 1 (Jan. 17, 1996); *see also In re Sealed Case*, 181 F.3d 128, 145-46 (D.C. Cir. 1999) (Henderson, J., concurring). The only justification that might conceivably apply here is the second—but given the *R.J. Reynolds* majority's repeated emphasis on *Zauderer*'s deception limitation, I do not see how it qualifies as even "arguably dictum." While a panel retains discretion to "determine that a statement in a prior decision was dictum, not requiring en banc action to reject," *id.* at 2-3, the panel here acknowledged it is "reasonable" to read *R.J. Reynolds*'s treatment of *Zauderer* as a holding—*see AMI I*, 746 F.3d at 1073 n.1 ("We recognize that reasonable judges may read *Reynolds* as *holding* that *Zauderer* can apply only where the government's interest is in correcting deception.") (emphasis added). Accordingly, the appropriate step under our procedure was

In sum, I do not understand how the panel opinion in this case came to be. Its issuance is inconsistent with our law of the circuit doctrine and runs counter to the principle of *stare decisis*, which " 'demands that we abide by a recent decision of one panel of this court unless the panel has withdrawn the opinion or the court en banc has overruled it.' " *In re Sealed Case*, 181 F.3d 128, 145 (D.C. Cir. 1999) (Henderson, J., concurring (quoting *Brewster v. Commissioner*, 607 F.2d 1369, 1373 (D.C. Cir. 1979)) (quotation marks omitted). I need hardly add my hope that this case is an outlier; if not, we risk adopting the habit of slapping the "dictum" label on any holding that any two of us find inconvenient and thereby replacing law of the circuit with law of the panel.

---

to include an *Irons* footnote rather than overruling *R.J. Reynolds* outright.

BROWN, *Circuit Judge*, dissenting: Throughout oral argument, AMI's counsel repeatedly summarized the analytical options before the en banc court:

> [T]he bottom line is if *Central Hudson* applies, [AMI] should prevail; if *Zauderer* applies only to deception, [AMI] should prevail; if *Zauderer* applies only to consumer protection, health and safety, and deception, [AMI] should prevail. The only way [AMI does not] prevail is if this Court concludes that *Zauderer* applies to any interest, no matter how articulated, no matter how speculative.

Tr. of Oral Arg. at 39, *Am. Meat. Inst. v. USDA*, No. 13-5281 (D.C. Cir. May 19, 2014) (en banc). No doubt counsel thought stating such an outrageous proposition would be sufficient to refute it. But, astonishing as it may be to First Amendment scholars, the court today doubles down on that extraordinary result. The court holds "*Zauderer* . . . reach[es] beyond problems of deception, sufficiently to encompass" factual and noncontroversial disclosure mandates aimed at providing more information to some consumers. Maj. Op. at 3. As a result, the fundamental First Amendment right not to be coerced or compelled to say what one would not say voluntarily is now demoted to a mere tautology: "[B]y acting . . . through a reasonably crafted disclosure mandate, the government meets its burden of showing that the mandate advances its interest in making the 'purely factual and uncontroversial information' accessible to the recipients." Maj. Op. at 15. In other words, a business owner no longer has a constitutionally protected right to refrain from speaking, as long as the government wants to use the company's product to convey "purely factual and uncontroversial" information.

In so finding, the court today ignores the plain words of *Zauderer*'s text and disregards its historical context; both the

text and history of the case emphasize the government's unique interest in preventing commercial deception. By expanding *Zauderer* beyond deception, the court has now created a standard that is actually even *more* relaxed than rational basis review; essentially, the new standard for compelled commercial disclosures—or perhaps even all commercial speech restrictions—thus becomes rational basis review minus any legitimate justification. Instead of requiring the government to justify its regulations, the court searches *sua sponte* through the underlying statute's legislative record, desperately seeking justifications while ignoring the agency's actual rulemaking record. Instead of relying on the precise interests articulated by the government in this case, the court tries to reclaim and rehabilitate rationales for the rule the agency has consistently discredited and denied: health and safety and domestic protectionism. Even rational basis review is less dismissive of constitutional guarantees.

The court's ardent reliance on the legislative record to justify the rule, in lieu of the regulatory text itself or the rulemaking record presented by the government, is baffling. Though this case has a constitutional dimension, it challenges an agency rulemaking. Ordinarily, that means our review is limited to the record as the agency presented it, *Camp v. Pitts*, 411 U.S. 138, 142 (1973), and confined to considering the agency's rationale as the agency articulated it, *SEC v. Chenery*, 332 U.S. 194, 196 (1947). But, tossing aside long-standing administrative law principles is only the beginning of the lengths to which the court goes to bust the mainspring of commercial speech jurisprudence. What began as robust protection from government coercion has now been reduced to an eerie echo of a supermarket tabloid's vacuous motto: the government may compel citizens to provide, against their will, whatever information "[i]nquiring minds want to know!"

I dissent.

## I

*Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985), did not appear *ex nihilo*, nor can its analysis be read *in vacuo*. Giving attention to all parts of the whole, and read in its historical context, *Zauderer*'s meaning cannot rationally be disputed. Only by plucking phrases from the analysis shorn of all contextual clues and by pretending the case stands completely outside the historical evolution of the Supreme Court's commercial speech doctrine can the court reach its disingenuous conclusions: (1) *Zauderer* "does not give a clear answer" to whether its principles apply more broadly to disclosures serving governmental interests beyond curing deception, Maj. Op. at 6; and (2) *Zauderer* "gives little indication of what type of interest might suffice," Maj. Op. at 9. If, as Jeremy Bentham once quipped, a fanciful argument may be dismissed as "nonsense upon stilts," the court's analysis in this case can best be described as delirium on a pogo stick.

## A

The court's erratic and idiosyncratic parsing of *Zauderer*'s text manages to create an impression of impenetrable opacity where the ordinary reader would find commendable clarity. Asserting that the "language with which *Zauderer* justified its approach . . . sweeps far more broadly than the interest in remedying deception," the court hinges its claims on just three scraps from *Zauderer*: a sentence about "material differences," a sentence buried in a footnote, and the word "minimal." *See* Maj. Op. at 7. Each plucked out of context.

As Chief Judge Garland explained to government counsel during oral argument, "If you're going to rely on *Zauderer*, you've got to take the whole thing." Tr. of Oral Arg. at 51, *Am. Meat. Inst.*, No. 13-5281 (D.C. Cir. May 19, 2014) (en banc). This is sound advice. Since the days of Chief Justice John Marshall, appellate courts have recognized the folly of lifting a general phrase or sentence out of an opinion and applying it to an entirely different context. *See, e.g.*, *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399 (1821). The Supreme Court recently affirmed that wisdom in *Arkansas Game & Fish Commission v. United States*, 133 S. Ct. 511 (2012), where the Court recalled Marshall's "sage observation that 'general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used,'" *id.* at 520 (quoting *Cohens*, 19 U.S. (6 Wheat.) at 399). *Zauderer* is triggered by its context and is incoherent when unmoored from the deception rationale.

In *Zauderer*, an attorney challenged Ohio's restrictions on lawyer advertising after he was disciplined for certain allegedly misleading newspaper advertisements. Specifically, when one advertisement promised clients would owe no legal fees in cases without a recovery, the disciplinary office complained the ad failed to follow regulations requiring disclosure that clients still may be liable for costs in unsuccessful claims. *See Zauderer*, 471 U.S. at 630–34.

First, the Supreme Court clarified both that the First Amendment protects commercial speech, *id.* at 637–38, and that it protects advertisers from compelled speech. *Id.* at 650–51. However, the First Amendment does not shield deceptive, false, or fraudulent speech that proposes a commercial transaction. *Id.* at 638. But, where that deceptive advertising could be cured by more speech, the government may choose between requiring disclosure and directly prohibiting the

advertisement. *Id.* at 651. While there are "material differences" between disclosure requirements and outright prohibitions, compelled speech "may be as violative of the First Amendment as [prohibited] speech," and the government faces a heavy burden to justify involuntary affirmation (being forced to carry the government's message). *Id*. at 650. After reconfirming that the government may not attempt to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens" to conform to the state's assumptions, *id.* at 651, the Court then contrasted the imposition of orthodoxy—prohibited by the First Amendment—with Ohio's regulation of deceptive commercial advertising. When the purpose of compelling factual information is to cure deception, the advertiser's "constitutionally protected interest . . . is minimal." *Id*. To avoid any possible confusion, the court succinctly summarized: "[W]e hold that an *advertiser's rights* are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers." *Id.* (emphasis added).

Crucial to the Court's analysis was not *just* the difference between disclosure and prohibition; it was also the difference between disclosure in advertising and that advertisement's outright prohibition, given the state's prerogative to prohibit misleading commercial speech. The Court was absolutely clear: "[B]ecause disclosure requirements trench much more narrowly on an *advertiser's* interests than do flat prohibitions on speech, warnings or disclaimers might be appropriately required in order to dissipate *the possibility of consumer confusion or deception*." *Id.* (emphasis added). In short, the state's option to require a curative disclosure cannot be disconnected from its right to entirely prohibit deceptive, fraudulent, or misleading commercial speech. Requiring an advertiser to provide "somewhat *more* information than they

might otherwise be inclined to present," *id.* at 650 (emphasis added), is thus constitutionally permissible when the government's available alternative is to completely ban that deceptive speech. Nowhere does *Zauderer* claim a commercial speaker can be *forced* to speak factual and noncontroversial information in the first instance. Instead, the text emphasizes the interests of advertisers, i.e., those who have already spoken. *See, e.g.*, *id.* at 651 (noting minimal constitutionally protected interest in "not providing any particular factual information *in . . . advertising*") (emphasis added).[1]

Thus, even when the advertiser makes affirmative claims and the basis for a curative disclosure is self-evident, the advertiser still retains minimal First Amendment protections. Conversely, when the government is not curing deception, constitutional protections remain robust and undiminished. That the compelled information must be factual and noncontroversial is part of the government's burden. This characterization is not a trigger that transforms every seller's packaging into the government's billboard.

Inexplicably, the court now upends the precise constitutional hierarchy outlined in *Zauderer* by ignoring the clear linkage between advertising, deception, and the state interest in curing that deception, which forms the core of the Supreme Court's reasoning.

---

[1] *Accord United States v. United Foods, Inc.*, 533 U.S. 405, 416 (2001) (noting, in *Zauderer*, that the Court permitted disclosure mandates for "attorneys who advertised *by their own choice*" and made potentially misleading statements (emphasis added)).

B

By parsing *Zauderer* in such a piecemeal fashion, this court robs the decision of its internal consistency and strips it of any historical context. The Framers resisted adding a Bill of Rights to the Constitution because they feared the elucidation of some rights would overshadow the *telos* inherent in the Constitution as a whole. The Constitution of liberty they conceived was premised on the natural law and conceded the immanence of the first principle of that law— that an adult human being, as a free moral agent, cannot be coerced without good reason. At the same time, they understood James Wilson's observation that no one ever had a natural right to do wrong. This is precisely the balance the Supreme Court struck in its early opinions acknowledging protection for commercial speech.

When the Supreme Court extended formal constitutional protection to commercial speech, it emphasized that false or misleading commercial speech remained unprotected. *See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 772 & n.24 (1976). Granting constitutional protection to commercial speech did not preclude regulation of false or deceptive advertising; accordingly, the Court anticipated that the government might "require that a commercial message appear in such a form, or include such additional information, warnings, and disclaimers, as are *necessary to prevent its being deceptive*." *Id.* (emphasis added). Sanctioning disclosure was not an exception to the otherwise stringent protections of the First Amendment; rather, it was the Court's acknowledgement that sellers of products had no right under our constitutional regime to wrongly deceive consumers. Thus, the Court made a sensible distinction between expression of opinion (which is

protected even if it is incorrect) and expression of commercial fact, for which the state can require accuracy.

The court disregards the Supreme Court's extraordinarily consistent jurisprudence in this area, from *Virginia Board* to *Zauderer* through the present day: the government may regulate commercial speech to avoid misleading or confusing consumers. While broad bans on nonmisleading commercial speech were immediately suspect, the Court repeatedly affirmed the narrow niche occupied by actual, inherently, and potentially deceptive speech subject to government regulation. *See, e.g.*, *Linmark Assocs., Inc. v. Willingboro Twp.*, 431 U.S. 85, 98 (1977) (remarking "laws requiring [false and misleading] signs to appear in such a form, or include such additional information as is necessary to prevent their being deceptive . . . would raise very different constitutional questions" than the unconstitutional ban on all "for sale" signs); *Bates v. State Bar of Ariz.*, 433 U.S. 350, 375 (1977) ("[T]he bar retains the power to correct omissions that have the effect of presenting an inaccurate picture . . . ."); *Bates*, 433 U.S. at 383–84 (noting certain claims "not susceptible of measurement or verification . . . may be so likely to be misleading as to warrant restriction"); *Bates*, 433 U.S. at 383–84 ("We do not foreclose the possibility that some limited supplementation, by way of warning or disclaimer or the like, might be required of [an advertisement] so as to assure that the consumer is not misled."); *In re R.M.J.*, 455 U.S. 191, 200–01 (1982) (reiterating *Bates*'s conclusion that warnings or disclaimers "might be appropriately required . . . in order to dissipate the possibility of consumer confusion or deception"); *In re R.M.J.*, 455 U.S. at 200 n.11 (noting the governmental entity "could require disclaimers or explanations to avoid false hopes"); *In re R.M.J.*, 455 U.S. at 202 ("[R]egulation . . . [is] permissible where the particular advertising is inherently likely to deceive

or where the record indicates that a particular form or method of advertising has in fact been deceptive."); *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 65 (1983) ("In light of the greater potential for deception or confusion in the context of certain advertising messages, content-based restrictions on commercial speech may be permissible.").

Thus, when the Court was confronted for the first time, in *Zauderer*, with the constitutionality of a disclosure requirement, it studied and relied on this prior commercial speech jurisprudence concerning deception to reach its ultimate holding. *See Zauderer*, 471 U.S. at 651 ("*[I]n virtually all our commercial speech decisions to date*, we have emphasized that because disclosure requirements trench much more narrowly on an advertiser's interests than do flat prohibitions on speech, warnings or disclaimers might be appropriately required in order to dissipate the possibility of consumer confusion and deception." (emphasis added) (citing cases)); *see also id.* at 646 ("*Our recent decisions involving commercial speech* have been grounded in the faith that the free flow of commercial information is valuable enough to justify imposing on would-be regulators the costs of distinguishing the truthful from the *false*, the helpful from the *misleading*, and the harmless from the *harmful*." (emphasis added)). Instead of viewing *Zauderer* in its proper context, the court claims *Zauderer*'s deception-specific language is "simply descriptive of the circumstances to which the Court applied its new rule." Maj. Op. at 7. But this conclusion is belied by the cases preceding *Zauderer* as well as the cases following it.

If, when the opinion was issued, there was any doubt *Zauderer* only applied to mandates targeting deception, that doubt dissipates given the Supreme Court's dogged adherence to this singular rationale. *See, e.g.*, *Peel v. Attorney*

*Registration & Disciplinary Comm'n of Ill.*, 496 U.S. 91, 110 (1990) ("To the extent that potentially misleading statements of private certification or specialization could confuse consumers, a State might consider . . . requiring a disclaimer about the certifying organization or the standards of a specialty."); *Ibanez v. Fla. Dep't of Bus. & Prof'l Regulation*, 512 U.S. 136, 146–47 (1994) (noting the hypothetical possibility that a different disclaimer "might serve as an appropriately tailored check against deception or confusion"); *Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457, 490–91 (1997) (Souter, J., dissenting) ("*Zauderer* thereby reaffirmed a longstanding preference for disclosure requirements over outright bans, as more narrowly tailored cures for the potential of commercial messages to mislead by saying too little. But however long the pedigree of such mandates may be, and however broad the government's authority to impose them, *Zauderer* carries no authority for a mandate unrelated to the interest in avoiding misleading or incomplete commercial messages." (citations omitted)); *United States v. United Foods, Inc.*, 533 U.S. 405, 416 (2001) ("There is no suggestion in the case now before us that the mandatory assessments imposed to require one group of private persons to pay for speech by others are somehow necessary to make voluntary advertisements nonmisleading for consumers."); *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 250 (2010) (upholding disclosure requirement as "reasonably related to the State's interest in preventing deception")[2]; *see also Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 576 (2001) (Thomas, J., concurring in

---

[2] Significantly, in *Milavetz*, the Court also declined to adopt the government's overarching description of the rule as bearing a reasonable relationship to a "valid state interest." *See* Br. for the United States at 55, *Milavetz*, 559 U.S. 229 (2010) (Nos. 08-1119, 08-1225), 2009 WL 3391429.

part and concurring in the judgment) ("[I]t is more 'appropriate to require that a commercial message appear in such a form, or include such additional information, warnings, and disclaimers, as are necessary to prevent its being deceptive.' Whatever the validity of this reasoning, it is limited to the peculiarly *commercial* harms that commercial speech can threaten—*i.e.*, the risk of deceptive or misleading advertising." (citations omitted)); *Borgner v. Fla. Bd. of Dentistry*, 537 U.S. 1080 (2002) (Thomas, J., dissenting to denial of certiorari, joined by Ginsburg, J.) ("If the disclaimer creates confusion rather than eliminating it, the only possible constitutional justification for this speech regulation is defeated.").

In *R.J. Reynolds*, a panel of this court followed *Zauderer*'s text to its logical conclusion: "[B]y its own terms, *Zauderer*'s holding is limited to cases in which disclosure requirements are 'reasonably related to the State's interest in preventing deception of consumers.'" *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1213 (D.C. Cir. 2012) (quoting *Zauderer*, 471 U.S. at 651). This court then went on to examine Supreme Court jurisprudence following *Zauderer*—including *Milavetz*—to reaffirm that conclusion. The original *AMI* panel was wrong to contradict *R.J. Reynolds*, and the en banc court today is wrong to overrule it.

Thus, not only did the Supreme Court recognize *Zauderer*'s clarity (and limitations), so too did this court. In fact, even the government—in previous filings *in this very case*—recognized the clear import of *Zauderer*. *See, e.g.*, Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. at 32, *Am. Meat Inst. v. USDA*, 968 F. Supp. 2d 38 (D.D.C. 2013) (No. 13-CV-1033), ECF No. 30, *reprinted in* J.A. 999 ("In order for *Zauderer* to apply to a commercial speech regulation, the regulation must be aimed at correcting misleading speech and

preventing deception of consumers." (citing *Milavetz*, 559 U.S. at 249–50)). *But see* Tr. of Oral Arg. at 43, *Am. Meat. Inst.*, No. 13-5281 (D.C. Cir. May 19, 2014) (en banc) (Government: "[I]t's simply not a proper reading of [*Zauderer*] to describe it as a case about combatting deception.").

The clear trajectory of the Supreme Court's jurisprudence is toward greater protection for commercial speech, not less. *See, e.g.*, *Milavetz*, 559 U.S. at 255 (Thomas, J., concurring in part and concurring in the judgment) ("I would be willing to reexamine *Zauderer* and its progeny in an appropriate case to determine whether these precedents provide sufficient First Amendment protection against government-mandated disclosures."); *Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653, 2667–72 (2011) (striking down law burdening commercial speech under intermediate scrutiny); *Nike, Inc. v. Kasky*, 539 U.S. 654, 676 (2003) (Breyer, J., dissenting) (arguing for heightened scrutiny to apply to commercial speech when it involves a matter of public concern); *Lorillard Tobacco Co.*, 533 U.S. at 576 (Thomas, J., concurring in part and concurring in the judgment) (calling for content-discriminatory regulation unrelated to the preservation of the fair-bargaining process to be subjected to strict scrutiny). For that reason, the government's litigating position in this case, which this court adopts, has been particularly troubling. The government has repeatedly attempted to focus the court on *Appellants'* interests, instead of its own. *See* Gov't Supp'l Br. at 13–15; Tr. of Oral Arg. at 40, *Am. Meat. Inst.*, No. 13-5281 (D.C. Cir. May 19, 2014) (en banc). In fact, the government does not even mention its own interest in burdening First Amendment rights until the very last page of its brief, and even then, confines the interest to one sentence that cites the original *AMI* Panel's opinion, instead of the record. *See* Gov't Supp'l Br. at 20. This is backwards; the heart of the

First Amendment analysis begins with the government's justification for interfering with such a fundamental right. *See, e.g.*, *Texas v. Johnson*, 491 U.S. 397, 406–07 (1989) ("It is, in short, . . . the governmental interest at stake that helps to determine whether a restriction on . . . expression is valid.").

The government even goes so far as to argue the "applicability of the *Zauderer* standard does not depend upon the government's justification for the required disclosure [and] [i]nstead . . . [is] premised on" the commercial actor's limited interests. Gov't Supp'l Br. at 5; *see also id.* at 7 ("But the nature of the government's reason for requiring disclosure does not affect whether the *Zauderer* standard applies."). And at oral argument, the government—before correction by the Chief Judge—essentially argued compelled commercial disclosures implicate no First Amendment interests at all. *See* Tr. of Oral Arg. at 50, *Am. Meat. Inst.*, No. 13-5281 (D.C. Cir. May 19, 2014) (en banc) (arguing the analysis might be different if "the *actual* First Amendment interest might start to crop up on the other side" (emphasis added)); *id.* at 50–51 (stating government is "not interested in . . . quibbling" as to whether Appellants have a First Amendment interest); *see also* Gov't Supp'l Br. at 11 ("[D]isclosure requirements are subject to First Amendment scrutiny *only insofar as* they threaten to chill protected speech.").

Several members of this court seemed to find these arguments troubling. *See* Tr. of Oral Arg. at 40–41, *Am. Meat. Inst.*, No. 13-5281 (D.C. Cir. May 19, 2014) (en banc) (Judge Kavanaugh: "This is a First Amendment case. We usually don't start that way[. We] usually start by asking what's the government's interest in burdening the speaker or the speech."); *id.* at 50 (Judge Brown: "You don't think that compelling speech is a First Amendment interest?"); *id.* (Judge Kavanaugh: "[Y]ou were suggesting that they were

outside—there was no First Amendment issue at all here."); *id.* at 51 (Chief Judge Garland: "[I]t's not quibbling. The Supreme Court in Footnote 14 in *Zauderer* . . . doesn't say [the First Amendment interests implicated by disclosure requirements] [a]re nonexistent. Is the government's position that they're nonexistent?"). Yet, remarkably, the court today agrees with the government that the First Amendment no longer matters here, as long as a court can agree the compelled information is factual and uncontroversial.

## II

Despite the clear protections granted to commercial speech since 1972, the court now invents a First Amendment standard that provides even less protection than rational basis review. To say this result is anomalous is an understatement. No one has argued in this case that the government can never compel the sellers of products to give notice to consumers. The only question here is who bears the burden of justification and what level of interest is sufficient. And when we are dealing with fundamental First Amendment protections, as we are here, the burden is on the government, and it is the government that must assert substantial interests. *See Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989) ("[T]he State bears the burden of justifying its [commercial speech] restrictions.") Curiously, the court disagrees, salvaging interests the government disclaimed to uphold a regulation the government never adequately justified. Compelled disclosure, says the court, can "rest on other suppositions as opposed to the precise interests put forward by the State." Maj. Op. at 12

15

A

Although we have sometimes characterized the *Zauderer* standard as similar to rational basis review, *see R.J. Reynolds*, 696 F.3d at 1212, even the court acknowledges it is essentially an application of *Central Hudson*'s intermediate scrutiny. *See* Maj. Op. at 16; Kavanaugh Op. at 6–7. And, if *Zauderer*'s import is clear when read alone, and pellucid when its analysis is placed in historical context, it is even more unmistakable when seen as a specialized subset of *Central Hudson*'s intermediate scrutiny.

*Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980), clarifies the intermediate scrutiny standard applicable to commercial speech restrictions: the government's *asserted* interest must be substantial; the regulation must directly advance that interest; and the regulation must be no more extensive than is necessary to serve that interest, *id.* at 564. This standard applies not only to speech restrictions but also to compelled speech; the right not to speak has been protected commercially just as it has been protected generally. *See, e.g.*, *United Foods, Inc.*, 533 U.S. at 410 (protecting right against compelled speech, even if commercial speech is ordinarily subject to lesser safeguards); *cf. Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796–97 (1988) ("[I]n the context of protected speech, the difference [between compelled speech and compelled silence] is without constitutional significance, for the First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what not to say."). Thus, the general rule is that government may not compel speech without satisfying at least a substantial burden: intermediate scrutiny. *See Riley*, 487 U.S. at 796–97. And when the government attempts to compel individuals to

express a certain viewpoint, the government's action is subject to an even higher burden: strict scrutiny. *See Wooley v. Maynard,* 430 U.S. 705, 714–15 (1977); *see also Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 12–15 (1986); *Zauderer*, 471 U.S. at 650.

*Zauderer*'s narrowly crafted exception to this rule does not offer a dispensation from *Central Hudson*'s intermediate scrutiny. Rather the government's burden under intermediate scrutiny is effectively met when the government commands purely factual and noncontroversial disclosures to prevent deceptive advertising.[3] *See Zauderer*, 471 U.S. at 651. *Zauderer* is, in essence, a shortcut, "where several of *Central Hudson*'s elements have already been established." AMI Supp'l Br. at 9.

To illustrate: Under *Central Hudson*, the government must first assert a substantial interest. Preventing inherent or actual deception in commercial advertising will always be such a substantial interest, so *Zauderer* satisfies the first element. Next, when a government's disclosure mandate is reasonably related to its deception interest—as *Zauderer* requires—we can be assured the disclosure will directly advance that interest; in other words, a reasonably related curative disclosure will necessarily make the deceptive advertisement less misleading. Finally, a disclosure requirement will be less restrictive than an outright ban, or no more extensive than necessary to cure the deception.

---

[3] When compelled disclosures do not contain "purely factual and uncontroversial information" to correct deception in advertising, strict scrutiny applies. *Zauderer*, 471 U.S. at 651; *accord Pac. Gas & Elec. Co.*, 475 U.S. at 12–15.

When the government's interest is not in curing deceptive advertising, however, *Zauderer* does not apply. The commercial speech "may be restricted only in the service of a substantial . . . interest" articulated by the government, and "only through means that directly advance that interest." *Zauderer*, 471 U.S. at 638 (citing *Central Hudson*, 447 U.S. at 566); *see also In re R.M.J.*, 455 U.S. at 203 (noting when a statement is not misleading in any way—real, inherent, or potential—the Court mandates that the state's authority be subject to serving a "substantial interest," interfering with speech only in proportion to the interest served, and being narrowly drawn). *Central Hudson*—without any shortcuts— applies to disclosures that target interests other than deception.

Unsatisfied with eviscerating *Zauderer*'s protective limits, the court proceeds to lay the groundwork to disembowel *Central Hudson* as well. *See, e.g.*, Maj. Op. at 14 ("*Zauderer*'s method of evaluating fit differs in wording [from *Central Hudson*], though perhaps not significantly in substance . . . ."). By holding the amorphous interests in today's case to be "substantial" (and questioning whether any governmental interest could fail to be substantial, except those already found to be trivial, *see* Maj. Op. at 8–9), the court effectively absolves the government of any burden. Any interest that is not "trivial" will do.

## B

Although the court declines to "consider to what extent a mandate reviewed under *Zauderer* can rest on other suppositions as opposed to the precise interests put forward by the State," Maj. Op. at 12, it nonetheless relies on interests the agency never asserted and even denied were rationales for the rule. This takes the evil of post hoc rationalization to a

whole new level. And the court forgets that it is assessing the propriety of administrative action, when a reviewing court is limited to the administrative record and must judge the rule "solely by the grounds invoked by the agency." *Chenery*, 332 U.S. at 196; *see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) ("It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself."). If the grounds asserted by the agency "are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis." *Chenery*, 332 U.S. at 196. The court violates this bedrock principle of administrative law today.

The court asserts "AMI makes no claim that the agency's exercises of its discretion are of constitutional moment . . . ." Maj. Op. at 12. This is more of a non sequitur than an explanation.[4] The litigants have assumed the usual rules applied. The court has changed the game, invoking exceptions which played no role in the panel decision. But here the court's exceptions only prove the wisdom of the rules. First, that the statute itself mandates a course of action is of no moment. This is often the case. *See, e.g.*, *R.J. Reynolds*, 696 F.3d at 1208–09. Moreover, *Chenery* applies with equal force to statutory interpretation. *N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 860 (D.C. Cir. 2012). Second, the "statutorily compelled" exception assumes the

---

[4] *See* AMI's First Amended Complaint, *Am. Meat Inst. v. USDA*, 968 F. Supp. 2d 38 (D.D.C. 2013) (No. 13-CV-1033), ECF No. 15, *reprinted in* J.A. 25–26, ¶¶ 72–79; *Am. Meat Inst. v. USDA*, 746 F.3d 1065, 1067–68 (D.C. Cir. 2014) ("[AMI] challenged the 2013 rule in district court as a violation of the COOL statute and the First Amendment."); Maj Op. at 5 ("AMI argues that the 2013 rule violates its First Amendment right to freedom of speech . . . .").

agency decision—even if premised on a debatable or erroneous ground—would be unchanged by the "useless formality" of court review. Henry J. Friendly, *Chenery Revisited: Reflections on Reversal and Remand of Administrative Orders,* 2 DUKE L.J. 199, 210 (1969). But the agency's specific implementation is *not* compelled by the statute. Indeed, this is the agency's second try.

Likewise, if the court means to rely on the background presumption of the constitutionality of Congressional legislation, that presumption is consistent with rational basis review, *Katzenbach v. Morgan*, 384 U.S. 641, 653 (1966), but clearly improper where heightened constitutional scrutiny is demanded, *see, e.g.*, *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664–67 (1994). Heightened scrutiny requires considerable and specific Congressional findings to establish that the government's asserted interest is substantial. *See id.* at 666. Thus, even accepting the court's doubtful assertion that it can completely ignore the rulemaking record in this case, the government's burden could never be met by the "hypothesized justifications" based on a few scattered comments in the legislative record. *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002); *see also Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 89 (2000) (noting that the government's burden under heightened scrutiny is not met where the legislative record consists "almost entirely of isolated sentences clipped from floor debates and legislative reports").

In any event, the mere presence of substantial Congressional findings is not alone sufficient. The *Central Hudson* test requires "the Government not only to identify specifically a substantial interest to be achieved . . . but also to prove that the regulation directly advances that interest and is not more extensive than is necessary to serve that interest."

*Thompson*, 535 U.S. at 374. The "congruence and proportionality" test announced in *Central Hudson*—and applied in other heightened scrutiny cases—is not satisfied where the legislative record offers only "scant support" for Congress's conclusions. *See Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*, 527 U.S. 627, 645–47 (1999).

The government's only asserted interest for the rule throughout this litigation—after abandoning its half-hearted post hoc deception rationale—has been a consistently vague one: "The government's interest is in providing consumers with information that those consumers can use to make choices about the food that they will . . . purchase and serve to their families or eat themselves." Tr. of Oral Arg. at 41, *Am. Meat. Inst.*, No. 13-5281 (D.C. Cir. May 19, 2014) (en banc); *see also* Gov't Supp'l Br. at 20 (referring to "the benefit of allowing customers to know the country of origin of their food" as the government interest); Mandatory Country of Origin Labeling, 74 Fed. Reg. 2658, 2683 (Jan. 15, 2009) [hereinafter "2009 Rule"] (noting "interest by *some* consumers in the country of origin of food" (emphasis added)). Yet the government has never explained precisely *why* origin information assists with customer preferences, only suggesting "the production steps in each country *may* embody latent (hidden or unobservable) attributes, which *may* be important to individual consumers." Mandatory Country of Origin Labeling, 78 Fed. Reg. 31,367, 31,377 (May 24, 2013) [hereinafter "2013 Rule"] (emphasis added). The government never suggests, explains, or supports what those attributes might be. More importantly, the government never explains why coerced speech is the only solution.

The agency's stated ambiguous and amorphous interest in giving consumers more information is undoubtedly

insufficient to survive even under an expanded-*Zauderer* regime.  *See Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 74 (2d Cir. 1996) (holding "consumer curiosity alone is not a strong enough state interest to sustain the compulsion of even an accurate, factual statement . . . in a commercial context"); *accord Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 115 n.6 (2d Cir. 2001); *see also* Kavanaugh Op. at 3 (conceding "it is plainly not enough for the Government to say simply that it has a substantial interest in giving consumers information").  By applying *Zauderer* to this case, the court invents a new standard that, in practice, is even more relaxed than rational basis review.  Now, commercial disclosure mandates are subject only to rational basis review minus any legitimate justification.  *See* Tr. of Oral Arg. at 85, *Am. Meat. Inst.*, No. 13-5281 (D.C. Cir. May 19, 2014) (en banc) ("[I]f you accept the panel's ruling here, this is rational basis minus, and when you are talking about where speech is compelled, you have to apply some standard other than that there be any interest in the air.").  Undaunted, the court borrows the *res ipsa loquitur* doctrine from tort law to conclude the "self-evident tendency of a disclosure mandate to assure that recipients get the mandated information," Maj. Op. at 15, satisfies the government's "burden of showing that [compelled disclosure] advances its interest in making the . . . information accessible to the recipients," Maj. Op. at 15.  Seriously?  With logic like this, who needs a Ministry of Truth?[5]  However, should this fog of airy circumlocutions prove too frustratingly elusive, the government need not justify its actions at all.  As noted, the court is willing to change the rules so it may selectively rely on the legislative record of the underlying statute, while disregarding the agency rulemaking challenged in this case.  For the court to *sua sponte* rely on legislative history instead of either  the

---

[5] *See* GEORGE ORWELL, NINETEEN EIGHTY-FOUR (1949).

regulatory text or the rulemaking record reverses the poles of administrative law.  *See* Tr. of Oral Arg. at 38, *Am. Meat. Inst.*, No. 13-5281 (D.C. Cir. May 19, 2014) (en banc) ("The two interests that the panel identified are both interests that the government has expressly disclaimed.  It would be a remarkable thing for this Court to apply *Zauderer* in those circumstances given the government's expressed disclaiming of those interests."); *see also* Alex Kozinski, *Should Reading Legislative History Be an Impeachable Offense?*, 31 SUFFOLK U. L. REV. 807, 812–13 (1998) (noting, among other things, that legislative history "is often contradictory, giving courts a chance to pick and choose those bits which support the result the judges want to reach"); Patricia M. Wald, *Some Observations on the Use of Legislative History in the 1981 Supreme Court Term*, 68 IOWA L. REV. 195, 214 (1983) ("[C]iting legislative history is still . . . akin to looking over a crowd and picking out your friends.").

The result is a jumble, a messy amalgam of standards, legislative history, and administrative procedure.  The court is so committed to upholding this rule that it concludes "several aspects of the government's interest in country-of-origin labeling for food combine to make the interest substantial: the context and long history of country-of-origin disclosures to enable consumers to choose American-made products; the demonstrated consumer interest in extending country-of-origin labeling to food products; and the individual health concerns and market impacts that can arise in the event of a food-borne illness outbreak." Maj. Op. at 9.  On inspection, each of these "aspects," upon which the court so heavily leans, is foreclosed by history, governmental concession, and the record.

i

Contrary to the court's assertions, the "long history" of country-of-origin labeling cannot support the government's interest here. The court claims the rule's "historical pedigree . . . lifts it well above 'idle curiosity.'" Maj. Op. at 10. However, in the First Amendment context, which has been steadily evolving since the late 1800s, history is not "telling," Maj. Op. at 10; rather, it is an especially poor substitute for reasoned judgment. The Supreme Court's general reluctance to accept any free speech claims at the time country-of-origin labeling began certainly bears on the issue. *See* David M. Rabbant, *The First Amendment in Its Forgotten Years*, 90 YALE L.J. 514, 523 (1981) ("The overwhelming majority of prewar decisions in all jurisdictions rejected free speech claims, often by ignoring their existence.").

Modern "commercial speech" doctrine did not begin until the 1970s, when the Supreme Court formally extended First Amendment protection to commercial speech. *See Va. State Bd. of Pharmacy*, 425 U.S. at 762. That "Congress has been imposing [country-of-origin] mandates since 1890," Maj. Op. at 10, eighty-six years before commercial speech received explicit protection, thus tells us very little about the practice's constitutionality. The Court's terminology in these early years was something of a self-fulfilling prophecy; what we now call "commercial speech," the court simply referred to as "commercial advertising" or some other business activity. *See, e.g.*, *Valentine v. Chrestensen*, 316 U.S. 52, 54 (1942) (denying protection for "purely commercial advertising"); *Halter v. Nebraska*, 205 U.S. 34, 41, 45 (1907) (referring to "mere advertisement"); *see also* Alex Kozinski & Stuart Banner, Response, *The Anti-History and Pre-History of Commercial Speech*, 71 TEX. L. REV. 747, 756–57 (1993) ("But before 1971, no judge thought of the thing as

commercial speech—they called it 'advertising' . . . , or 'soliciting and canvassing,' or some such term that denoted a *business activity* rather than a form of expression."). This linguistic choice not only reflected the court's underlying thoughts and assumptions (i.e., that advertising was permissibly regulated as business conduct) but also likely influenced the litigating positions of parties. Litigants rarely raised First Amendment challenges to advertising restrictions—instead making substantive due process arguments by asserting restrictions affected their business rights.

For example, in 1907, when faced with the constitutional validity of a state law criminalizing the use of an American flag emblem on labels, the litigants and the Court "ignored potential free speech claims." Rabbant, *supra* at 531; *see Halter*, 205 U.S. at 38; Kozinski & Banner*, supra* at 763 ("No speech-related claim was made in *Halter*, probably . . . because the litigants didn't conceive of bottle-labeling as speech."). Rather, the defendants attacked the statute as repugnant to the Equal Protection and Due Process Clauses, challenges rejected by the Court. *See Halter*, 205 U.S. at 39; *see also* Rabbant, *supra* at 531 n.69. When the Court repeatedly referred to "mere advertisement," *Halter*, 205 U.S. at 41, 45, it did so in the context of analyzing substantive due process and property rights, not speech.

When at last the Supreme Court formally addressed the protection of "advertising" (again, its term), it noted, without citation, it was "clear that the Constitution imposes no such restraint on government as respects purely commercial advertising." *Chrestensen*, 316 U.S. at 54. "[T]his suggests that in 1942, the Justices considered the question whether the First Amendment has any application to advertising to be . . . easily resolved and not very important." Kozinski & Banner,

*supra* at 758. One reason for this certainty again may have been the concept that advertising was more a business activity—subject to the "then-recently-adopted deferential economic substantive due process jurisprudence"—than speech. *See id.* Again, given both *Christensen* and the prevailing view that advertising was conduct and not speech, the court's citation to early labeling regimes tells us nothing useful.

Additionally, the early years of free speech jurisprudence saw laws routinely upheld that by today's standards clearly interfere with commercial speech. *See, e.g.*, *Ex parte Rapier*, 143 U.S. 110 (1892); *Ex parte Jackson*, 96 U.S. 727 (1877). In the postal cases of the late 1800s, the Supreme Court focused on the right of Congress to exclude injurious matters from the mail, including materials advertising lotteries and other vices. The mailing prohibition's long history (since 1866!)—and the Court's decisions affirming it—did not stop the Supreme Court from later rejecting the laws under the new commercial speech doctrine. *See, e.g.*, *Bolger*, 463 U.S. at 72–76.

Furthermore, this court's reliance on *Burson v. Freeman*, 504 U.S. 191 (1992), to support its history rationale is inapposite. First, *Burson* was a "rare case," *id.* at 211, that involved a reconciliation of two competing fundamental rights—the right to engage in political discourse and the right to vote, "a right at the heart of our democracy," *id.* at 198. But *Burson* relied on history only to "demonstrate the *necessity* of restricted areas in and around polling places." *Id.* at 200. And, like *Zauderer, Burson* approves a limited intrusion on protected activity to prevent fraud. *Id.* at 199. Voter intimidation and election fraud were historically rampant, but the 1890 restrictions had ameliorated these problems. *Id.* at 207–08. In contrast, this court invokes the

long history of country-of-origin labeling laws to argue the necessity of the government's intrusion is self-evident. *Burson* simply does not stand for the proposition that a time-tested consensus can be a proxy for the substantiality of the government's interest in the First Amendment context. If that were true, the commercial speech doctrine would never have developed at all.

Similarly, *Edenfield v. Fane*, 507 U.S. 761 (1993), contradicts this court's actions and its analysis. In *Edenfield*, the Supreme Court emphasized the need to "identify with care the interests the State itself asserts" and noted "[u]nlike rational-basis review, the *Central Hudson* standard does not permit us to supplant the precise interests put forward by the State with other suppositions." *Id.* at 768. But that is exactly what the court does here.

ii

The court concludes protectionism or patriotism is the true motive of the challenged country-of-origin labeling scheme, even if it is only acknowledged with a sly wink by the government. *See* Kavanaugh Op. at 5 ("[T]he Executive Branch has refrained during this litigation from expressly articulating its . . . interest in supporting American farmers and ranchers in order to justify this law, apparently because of the international repercussions that might ensue."). The court assumes—perhaps correctly—that absent the constraints of various trade treaties, Congress would have an interest in promoting American products. *See* Maj. Op. at 9 (noting origin labeling "enable[s] consumers to choose American-made products"); Kavanaugh Op. at 6 (asserting the government "has a substantial interest in this case in supporting American farmers and ranchers against their foreign competitors"). But, that interest would constitute a

substantial justification for coercing speech only if the government had actually asserted it, and if voluntary action and direct government speech were obviously inadequate. Significantly, the court ignores the agency's disclaimers in this case. Not only has the agency failed to raise or support any protectionist motive, it has, in fact, consistently denied one. *See, e.g.*, 2013 Rule, 78 Fed. Reg. at 31,376 ("The availability of [country-of-origin labeling] information does not imply that there will necessarily be any change in aggregate consumer demand or in demand for products of one origin versus others."); 2009 Rule, 74 Fed. Reg. at 2670 ("[W]hile some U.S. producers may *hope* to receive benefits from the [country-of-origin labeling] program for products of U.S. origin, the purpose of the . . . program is to provide *consumers* with origin information." (emphasis added)); Mandatory Country of Origin Labeling, 68 Fed. Reg. 61,944, 61,955 (Oct. 30, 2003) [hereinafter "2003 Proposed Rule"] ("We find little evidence to support the notion that consumers' stated preferences for country of origin labeling will lead to increased demands for covered commodities bearing the U.S.-origin label."); 68 Fed. Reg. at 61,956 ("The lack of participation in government-provided programs for labeling products of U.S. origin provides evidence that consumers do not have a strong preference for country of origin labeling."); 68 Fed. Reg. at 61,956 ("The results from . . . surveys indicate that the number of consumers with strong preferences for U.S.-origin labeled products is not sufficient for U.S. producers to benefit from labeling."); *accord* Tr. of Oral Arg. at 53, *Am. Meat. Inst.*, No. 13-5281 (D.C. Cir. May 19, 2014) (en banc) (explaining government is not asserting an interest in helping American ranchers).

28

iii

The court credits the government with acting *sub silentio* on the belief that food products produced wholly in the USA are safer than those produced even partly outside the USA. *See* Maj. Op. at 9 (asserting interest in "individual health concerns and market impacts that can arise in the event of a food-borne illness outbreak"); *id.* at 11 ("Supporting members of Congress identified the statute's purpose as enabling customers to make informed choices based on characteristics of the products they wish to purchase, including United States supervision of the entire production process for health and hygiene.")  Again, not only has the government failed to raise or support any motive in consumer health and safety, it has, in fact, consistently eschewed that interest as supporting the rule. *See, e.g.*, Mandatory Country of Origin Labeling, 78 Fed. Reg. 31,367, 31,372 (May 24, 2013) (noting the country-of-origin labeling program "is not food safety related"); 2009 Rule, 74 Fed. Reg. at 2679 ("[T]he [country-of-origin labeling] program is neither a food safety [n]or traceability program, but rather a consumer information program.  Food products, both imported and domestic, must meet the food safety standards of the FDA and [other agencies].  Food safety and traceability are not the stated intent of the rule . . . . "); 74 Fed. Reg. at 2683 (rejecting commenters' suggestions that country-of-origin labeling would provide "food safety benefits to consumers" because the program "does not address food safety issues"); 2003 Proposed Rule, 68 Fed. Reg. at 61,956 (noting that although some evidence suggests "consumers may use country of origin labeling as a proxy for food safety information," country of original labeling "does not provide valid information regarding food safety").  This undercuts the court's claim that "it seems reasonable for Congress to anticipate that many consumers will prefer food

that had been continuously under a particular government's direct scrutiny." Maj. Op. at 11.

Even the anecdotes in the legislative record do not, as the court contends, "broadly suggest[] the utility of [country-of-origin] disclosures in the event of any disease outbreak known to have a specific country of origin, foreign or domestic." Maj. Op. at 11–12. Rather, the Agency also discredited this very purpose: "Appropriate preventative measures and effective mechanisms to recall products in the event of contamination incidents are the means used to protect the health of the consuming public . . . ." 2009 Rule, 74 Fed. Reg. at 2683; *see id.* at 2679 (rejecting commenters' suggestions that the origin labeling program is "critical to respond to outbreaks of food borne illness"); *see also* Kavanaugh Op. at 3 ("[T]he Government cannot advance a traditional . . . health . . . or safety interest in this case because a country-of-origin disclosure requirement obviously does not serve [that] interest[].").  The court invokes a health and safety interest—even over the government's adamant objections—because health and safety will usually qualify as a substantial interest.  But the court forgets that the interest must at least be one asserted by the government—and certainly not one rejected by it.

III

This case is really not about country-of-origin labeling. It is not even about patriotism or protectionism. And it is certainly not about health and safety. What is apparent from the record and the briefing is that this is a case about seeking competitive advantage. One need only look at the parties and amici to recognize this rule benefits one group of American farmers and producers, while interfering with the practices and profits of other American businesses who rely on

imported meat to serve their customers. *See, e.g.*, Intervenors Br. at i (noting the United States Cattlemen's Association "present[s] an effective voice for the U.S. cattle industry and promot[es] ranching in the United States"); *id.* ("[United States Cattlemen's Association] works to promote the interests of cattlemen in the United States on issues such as the Country of Origin Labeling . . . program"); *id.* (explaining the National Farmers Union is a "national organization representing the interests of farmers and ranchers across the United States . . . by advocating the policy positions developed by its members . . . on issues such as [country-of-origin labeling]"); Supp'l Br. of Amici Curiae Food & Water Watch, et al., at iv (describing amici as "intimately involved in, and [having] spent considerable resources on, advocating for . . . the development of the [country-of-origin labeling] rule at issue in this case"); s*ee, e.g.*, Br. of Amicus Curiae Government of Canada at 3–4, 9 ("[P]arts of the U.S. industry that produce both U.S.-origin and mixed-origin meat face" much higher costs than slaughterhouses that rely on domestic livestock—a cost differential the WTO concluded has a "detrimental impact . . . [on the] competitive position of Canadian cattle and hogs in the U.S. market [that] could not be explained by the need to" inform consumers). Even the court's citation to the congressional record underscores this point. *See* Maj. Op. at 11 (citing statements from U.S. representatives hailing from Western states, including Oregon (Hooley and Wu) and California (Bono)). Such a disproportionate burden "stands in sharp conflict with the First Amendment's command that government regulation of speech must be measured in minimums, not maximums." *Riley,* 487 U.S. at 790.

Of course the victors today will be the victims tomorrow, because the standard created by this case will virtually ensure the producers supporting this labeling regime will one day be

saddled with objectionable disclosure requirements (perhaps to disclose cattle feed practices; how their cattle are raised; whether their cattle were medically treated and with what; the environmental effects of beef production; or even the union status or wage levels of their employees). Only the fertile imaginations of activists will limit what disclosures successful efforts from vegetarian, animal rights, environmental, consumer protection, or other as-yet-unknown lobbies may compel.

If patriotism or protectionism would sell products, producers and sellers would happily festoon their products with Made in the USA or Product of the USA labels. Thus, any consumer's desire to buy American could be easily satisfied by voluntary action. *See, e.g.*, 2009 Rule, 74 Fed. Reg. at 2682. Yet today this court offers to facilitate blatant rent-seeking behavior by announcing its willingness to intuit the government's unspoken agendas—perhaps one of the most dissembling things about the court's opinion. But, as bad as it is for the court to invent rationales the government does not actually offer, the reality is worse.

By substantiating the government's nebulous interests, the court essentially permits the government to commandeer the speech of others. There is no limiting principle for such a flimsy interest as the government asserted in this case. *See* Tr. of Oral Arg. at 28, *Am. Meat. Inst.*, No. 13-5281 (D.C. Cir. May 19, 2014) (en banc) ("There is absolutely no stopping point to [the government's consumer-interest] argument."); *id.* (Judge Kavanaugh: "The government wants no stopping point to that argument."). More alarmingly, such self-referential interests can be marshalled in aid of any sort of crony capitalism or ideological arm-twisting. This labeling scheme is only one example.

The scheme is not designed to inform consumers; it is designed to take away the price advantage enjoyed by one segment of a domestic industry. The government's alleged interest in providing information that some consumers may desire will actually result in higher prices. *See, e.g.*, Br. of Amicus Curiae Grocery Manufacturers Association at 11 ("The severe costs that the COOL requirements will impose on GMA's members are entirely out of proportion to the ethereal goal of affording consumers more information . . . ."); *see id.* at 11–12 ("If the COOL requirements are sustained, that sort of supply-chain management will become extremely costly or, for some manufacturers, cost prohibitive . . . ."). Forcing meat packers to pay a premium for domestic beef will raise costs for consumers. Query whether the protections of the First Amendment should be abrogated for some businesses in order to benefit other businesses. That approach not only swallows important First Amendment protections, it does so in order to discriminate in favor of particular segments of particular industries. The first Amendment ought not be construed to allow the government to compel speech in the service of speculative or hypothetical interests for purely private benefits. Once we articulate such a principle of constitutional adjudication, there is really no limit to what government may compel. And if this example of cronyism is okay, who will balk at any other economic or ideological discrimination? The only limit the court seemed to recognize during the oral argument was labels that overtly promote invidious discrimination,[6] but protectionism, patriotism, and environmentalism will be entirely permissible subjects for compelled labeling, especially where the motive

---

[6] *See* Tr. of Oral Arg. at 56, *Am. Meat. Inst.*, No. 13-5281 (D.C. Cir. May 19, 2014) (en banc) (Chief Judge Garland making the government's point that "it [is] a violation of the Constitution to discriminate on the basis of national origin among people already in the United States").

can remain unspoken. A generous swath of protection the First Amendment once afforded to businesses against such encroachment has now been ceded to the government's allegedly good intentions.

## IV

The court has taken a rationale developed in a specific context and applicable to a narrow subset of government activity—regulating speech that could be entirely prohibited—and fashioned a new, broad area of government power in which naked compulsion, once prohibited by the First Amendment, no longer requires any credible justification. The court accomplishes this extraordinary feat by plucking the phrase "factual and uncontroversial" out of the *Zauderer* analysis while pointedly ignoring another limitation: that the compelled disclosure must be justified and not unduly burdensome. This is a move which tends to dissolve the whole idea of a right *not* to speak. It is strongly reminiscent of C.S. Lewis's criticism of those who reject natural law and traditional morality:

> There has never been, and never will be, a radically new [judgment] of value in the history of the world. What purport to be new systems or (as they now call them) 'ideologies,' all consist of fragments from the [natural law] itself, arbitrarily wrenched from their context in the whole and then swollen to madness in their isolation . . . .

C.S. LEWIS, THE ABOLITION OF MAN 43–44 (Harper Collins 2001) (1944). That is what the court now announces. What was merely an observation in the well-ordered framework of *Zauderer* now becomes an overarching principle that subsumes the First Amendment. And it does so to facilitate

coercion and the imposition of orthodoxy. What is more uncontroversial than orthodoxy?

There can be no right *not* to speak when the government may compel its citizens to act as mouthpieces for whatever it deems factual and non-controversial and the determination of what is and what is not is left to the subjective and ad hoc whims of government bureaucrats or judges. In a world in which the existence of truth and objective reality are daily denied, and unverifiable hypotheses are deemed indisputable, what is claimed as fact may owe more to faith than science, and what is or is not controversial will lie in the eye of the beholder.

AMI's counsel began the en banc argument by positing an absurdity no sensible court could countenance—that *Zauderer* somehow permits the government to compel speech based on "any interest, no matter how articulated, no matter how speculative." Today, the court's commitment to country-of-origin labeling leads it to willfully distort the fundamental holding and limitations of *Zauderer* and a virtually unbroken line of Supreme Court precedent to do exactly that—a perniciously Procrustean solution that hacks the First Amendment down to fit in the government's hip pocket. I will not join the carnage.